Gary A. SOUCIE et al., Appellants

v.

Edward E. DAVID, Jr., Director, Office
of Science and Technology, et al.

No. 24573.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 7, 1970.

Decided April 13, 1971.

Wilkey, Circuit Judge, concurred
and filed opinion.

Mr. Peter L. Koff, Boston, Mass., with whom Messrs. Lawrence Speiser and Melvin L. Wulf, Washington, D. C., were on the brief, for appellants. Mrs. Hope Eastman, Washington, D. C., also entered an appearance for appellants.

Mr. Jeffrey F. Axelrad, Atty., Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., Robert V. Zener and Harland F. Leathers, Attys., Department of Justice, were on the brief, for appellees. Mr. Morton Hol-

lander, Atty., Department of Justice, also entered an appearance for appellees.

Mr. Peter L. Koff, Asst. Corporation Counsel for the City of Boston, Massachusetts, filed a brief on behalf of the City of Boston as amicus curiae.

Before BAZELON, Chief Judge, VAN DUSEN,* Circuit Judge, U. S. Court of Appeals for the Third Circuit, and WILKEY, Circuit Judge.

BAZELON, Chief Judge:

This is an appeal from the dismissal of a suit for injunctive relief under the Freedom of Information Act.[1] Two citizens seek to compel the Director of the Office of Science and Technology (OST)[2] to release to them a document, known as the Garwin Report, which evaluates the Federal Government's program for development of a supersonic transport aircraft (SST).[3]

The Report originated in the following manner. The President asked the Director of the OST, then Dr. Lee A. DuBridge,[4] to provide him with an "independent assessment" of the SST program. Dr. DuBridge convened a panel of experts, headed by Dr. Richard L. Garwin, to assist him. When the President learned of the panel, he asked to see its report. Dr. DuBridge subsequently transmitted the Garwin Report, along with his own evaluation, to the President.[5]

When appellants inquired about the Garwin Report, the OST indicated that it would not release the Report to members of the public because the Report was a Presidential document over which the OST had no control, and was "in the nature of inter- and intra-agency memoranda which contained opinions, conclusions and recommendations prepared for the advice of the President."[6] Appel-

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1964).

1. Pub.L.No.89–487, 80 Stat. 250 (1966), amending Administrative Procedure Act, ch. 324, § 3, 60 Stat. 238 (1946), 5 U.S.C. § 1002 (1964). Pub.L.No.89–487 was repealed, but its substantive provisions enacted into the United States Code, by Pub.L.No.90–23, 81 Stat. 54 (1967), 5 U.S.C. § 552 (Supp. V, 1970).

2. The OST was established in the Executive Office of the President by Reorganization Plan No. 2 of 1962, Pt. I, 3 C.F.R. 879 (1959–63 Compilation), set out following 5 U.S.C. § 133z–15 (1964), at 247. Section 133z–15 has been replaced by 5 U.S.C. § 913 (Supp. V, 1970).

3. The statutory basis for the SST program is a provision in the Federal Aviation Act of 1958 authorizing the Administrator of the Federal Aviation Agency to undertake research and development in aviation. Pub.L.No.85–726, Tit. III, § 312(c), 72 Stat. 752 (1958), 49 U.S.C. § 1353(c) (1964). This function was transferred to the Secretary of Transportation, to be exercised by the Federal Aviation Administrator, by the Department of Transportation Act. Pub.L.No. 89–670, § 6(c) (1), 80 Stat. 938 (1966), 49 U.S.C. § 1655(c) (1) (Supp. V, 1970).

4. Dr. Edward E. David, Jr. has replaced Dr. DuBridge as Director of the OST and as a party to this litigation.

5. These uncontroverted facts are set forth in the record in statements of Dr. DuBridge. Affidavit of Dr. Lee A. DuBridge, Appendix at 14–16; Letter of April 3, 1970 from Dr. Lee A. DuBridge to The Honorable Henry S. Reuss, Member of the United States House of Representatives, Appendix at 8–9.

6. Letter of May 20, 1970 from Mr. John D. Ehrlichman, Assistant to the President for Domestic Affairs, to The Honorable Henry S. Reuss, Member of the United States House of Representatives, Appendix at 11. In two letters to Dr. DuBridge, Mr. Reuss had tried to obtain the Garwin Report. Appendix at 6–7. Dr. DuBridge sent two letters in reply, the second of which referred Mr. Reuss' request to the Counsel to the President. Appendix at 8–10. Then Mr. Ehrlichman declined to release the Report to Mr. Reuss for the reason quoted in text above. When appellants' attorney Koff asked the OST about the availability of the Report, the Special Assistant to the Director told him that the OST "was without authority to make available to a member of the public the report of Dr. Garwin, since this matter involved a Presidential document over which the [OST] had no control, and that the [OST] would abide by the ruling of John D. Ehrlichman * * * as contained in his May 20, 1970 letter to The Honorable Henry S. Reuss * * * if a request for said report was made by

lants brought suit under the Freedom of Information Act to compel disclosure of the Report.[7] The District Court dismissed the complaint with a brief order stating that the Report is a Presidential document, and consequently, that the court has neither authority to compel its release nor jurisdiction over a suit to obtain that relief. At the hearing, the trial judge discussed the basis for his ruling. He stated that the OST is not an "agency" for the purposes of the Freedom of Information Act, but rather a part of the Office of the President, and that the Garwin Report is protected from compulsory disclosure by the doctrine of executive privilege.

In Part I of this opinion we review the origin and functions of the OST and conclude that the OST is an agency, and that the Garwin Report is an agency record. Consequently, subject to any constitutional issues which may be raised, the complaint states a cause of action under the Freedom of Information Act, and the District Court erred in dismissing the suit. The case must be remanded for that court to consider whether the document is protected, in whole or in part, by any of the specific exemptions enumerated in the Act. In Part II of this opinion we indicate some of the considerations that will be relevant to that determination.

While the District Court referred to the doctrine of executive privilege in support of its decision, the privilege was not expressly invoked by the Government, and therefore, it was not properly before the court.[8] Serious constitutional questions would be presented by a claim of executive privilege as a defense to a suit under the Freedom of Information Act,[9] and the court should

---

a member of the public." Affidavit of Peter L. Koff, Appendix at 12–13.

This chain of events provided ample basis for appellants to bypass as futile the step of filing a written request for the document, as ordinarily required by the OST, 32 Fed.Reg. 11,060 (1967). *See generally* 3 K. Davis, Administrative Law Treatise §§ 20.07–20.08 (1958, Supp. 1970); L. Jaffe, Judicial Control of Administrative Action 425–437, 446–449 (1965). The OST's refusal to disclose the Report to Mr. Reuss is especially significant, for while his right as a citizen to obtain the Report under the Act is equal to that of appellants, his right as a Congressman is presumably greater. See H.R.Rep.No.1497, 89th Cong., 2d Sess. 11–12 (1966).

7. The Act provides:

[E]ach agency, on request for identifiable records made in accordance with published rules stating the time, place, fees to the extent authorized by statute, and procedure to be followed, shall make the records promptly available to any person. On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complaint [sic]. In such a case the court shall determine the matter de novo and the burden is on the agency to sustain its action. In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee * * *.

5 U.S.C. § 552(a) (3) (Supp. V, 1970).

8. *See* United States v. Reynolds, 345 U.S. 1, 7–8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953):

The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party. It is not to be lightly invoked. There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer. [footnotes omitted.]

*See also* General Services Administration v. Benson, 415 F.2d 878, 879 (9th Cir. 1969).

9. The doctrine of executive privilege is to some degree inherent in the constitutional requirement of separation of powers. *See, e. g.,* Berger, Executive Privilege V. Congressional Inquiry (Pts. I & II), 12 U.C.L.A.L.Rev. 1043, 1287 (1965); Bishop, The Executive's Right of Privacy: An Unresolved Constitutional Question, 66 Yale L.J. 477 (1957); Davis, The Information Act: A Preliminary Analysis, 34 U.Chi.L.Rev. 761, 763–765 (1967). As the concurring opinion points out, the power of Congress to compel disclosure

avoid the unnecessary decision of those questions.[10] Accordingly, whether or not the Government makes a claim of privilege on remand, the court should first consider whether the Report falls within any statutory exemption.[11] Only if the Act seems to require disclosure, and if the Government makes an express claim of executive privilege, will it be necessary for the court to consider whether the disclosure provisions of the Act exceed the constitutional power of Congress to control the actions of the executive branch.[12]

## I

Congress passed the Freedom of Information Act in 1966 to strengthen the

of agency records to the public is no greater than its power to compel disclosure to Congress itself. Since 1789, Congress has frequently exercised the latter power in statutes requiring executive officers to transmit information to Congress. *See, e. g.*, Act of Sept. 2, 1789, ch. 12, § 2, 1 Stat. 65, as amended, 31 U.S.C. § 1002 (Supp. V, 1970) (Sec'y of Treasury must give certain information to either house of Congress on request); Act of May 29, 1928, ch. 901, § 2, 45 Stat. 996, as amended, 5 U.S.C. § 2954 (Supp. V, 1970) (each executive agency must disclose certain information to Gov't Operations Committees of House and Senate on request). However, courts have never been asked to rule on the scope of executive privilege in the context of a congressional command to disclose information. They have considered the scope of the privilege only in ruling on a litigant's request for discovery of information held by the Government, both in litigation with the Government, *e. g.*, Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), and in litigation between private parties, *e. g.*, Carl Zeiss Stiftung v. V. E.B. Carl Zeiss, Jena, 40 F.R.D. 318 (D.D.C.1966), aff'd per curiam, 128 U.S. App.D.C. 10, 384 F.2d 979, cert. denied, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967).

10. *See* Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 345–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

11. If the Government asserts a constitutional privilege on remand, the court will not thereby be deprived of jurisdiction, for the judicial power extends to resolving the questions of separation of powers raised by the constitutional claim. *See* Powell v. McCormack, 395 U.S. 486, 512–522, 548–549, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); Baker v. Carr, 369 U.S. 186, 198–204, 208–237, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *cf.* Berger (Pt.

II), *supra* note 9, at 1349–1360. The precise limits of legislative authority over the executive branch are not clear. In discussing the President's power to remove officers, the Supreme Court has drawn an uncertain distinction between officers who exercise purely executive functions, and those whose functions are quasi-legislative or quasi-judicial; only the former are removable at the will of the President in spite of a contrary congressional enactment. *Compare* Wiener v. United States, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958), and Humphrey's Ex'r v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), with Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). *See also* Kendall v. United States, 37 U.S. (12 Pet.) 524, 610, 612–613, 9 L.Ed. 1181 (1838).

12. The fact that the President may have ordered the Director of the OST not to release the Garwin Report does not leave the courts without power to review the legality of withholding the Report, for courts have power to compel subordinate executive officials to disobey illegal Presidential commands. *See* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). If nondisclosure of the Garwin Report is not supported by a statutory exemption or a constitutional executive privilege, the Freedom of Information Act requires issuance of an injunction to compel the OST to release the Report, whether the refusal to disclose is attributable to the OST or to the President. The President is not an indispensable party, because a "decree granting the relief sought will [not] require him to take action, either by exercising directly a power lodged in him or by having a subordinate exercise it for him," and because "the decree which is entered will effectively grant the relief desired by expending itself on the subordinate official who is before the court." Williams v. Fanning, 332 U.S. 490, 493, 494, 68 S.Ct. 188, 189, 92 L.Ed. 95 (1947).

disclosure requirements of the Administrative Procedure Act (APA). Each federal agency subject to the APA must now make its records, with certain specific exceptions, available to "any person" who requests them; district courts have jurisdiction to order the production of any "identifiable record" which is "improperly withheld," and "the burden is on the agency to sustain its action."

Under the APA, an agency is any "authority of the Government of the United States, whether or not it is within or subject to review by another agency."[13] The statutory definition of "agency" is not entirely clear, but the APA apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions.[14] While the primary purpose of the APA is to regulate the processes of rule making and adjudication, administrative entities that perform neither function are nevertheless agencies, and therefore subject to the public information provisions of the APA, i. e., the Freedom of Information Act.[15]

The District Court ruled that the OST is not an agency, but merely staff to the President.[16] On that theory, the only "authority" controlling the Garwin Report is the President, and the trial court held that the President is not subject to the disclosure provisions of the APA. We need not determine whether Congress intended the APA to apply to the President,[17] and whether the Constitution would permit Congress to require disclosure of his records,[18] for we have concluded that the OST is a separate agency, subject to the requirements of the Freedom of Information Act, and that the Garwin Report is a record of that agency.

The OST, created in 1962 by an executive reorganization plan, is authorized (1) to evaluate the scientific research programs of the various federal agencies, and (2) to advise and assist the President in achieving coordinated federal

13. 5 U.S.C. § 551(1) (Supp. V, 1970).

14. *See* H.R.Rep.No.1980, 79th Cong., 2d Sess. 19 (1946); S.Rep.No.752, 79th Cong., 1st Sess. 10 (1945); Staff of Senate Comm. on the Judiciary, 79th Cong., 1st Sess., Report on the Administrative Procedure Act 2 (Comm. Print 1945); *Attorney General's Comm. on Administrative Procedure, Final Report*, Administrative Procedure in Government Agencies, S.Doc.No.8, 77th Cong., 1st Sess. 7 (1941); Attorney General's Manual on the Administrative Procedure Act 9–10 (1947). *See generally* Freedman, Administrative Procedure and the Control of Foreign Direct Investment, 119 U.Pa. L.Rev. 1, 4–18 (1970).

15. *See* H.R.Rep.No.1980, 79th Cong., 2d Sess. 19 (1946); Staff of Senate Comm. on the Judiciary, 79th Cong., 1st Sess., Report on the Administrative Procedure Act 2 (Comm. Print 1945); Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act 4 (1967). For example, the APA's definition of agency apparently includes the U. S. Commission on Civil Rights, which investigates, evaluates and recommends, but does not adjudicate. Civil Rights Act of 1957, Pub.L. No. 85–315, Pt. I, 71 Stat. 635, as amended, 42

U.S.C. § 1975c (Supp. V, 1970); Larche v. Hannah, 176 F.Supp. 791, 796 & n. 15 (W.D.La.1959) (Comm'n is an agency and subject to APA's adjudication provisions), adopted in 177 F.Supp. 816, 819 n. 5 (W.D.La.1959) (three-judge court), rev'd on other grounds, 363 U.S. 420, 441, 452–453, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) (Comm'n is not subject to APA's adjudication provisions). *See also* Exec. Order No. 11,236, 3 C.F.R. 329 (1964–1965 Compilation); Skolnick v. Parsons, 397 F.2d 523 (7th Cir. 1968) (President's Comm'n on Law Enforcement & Admin. of Justice).

16. *Compare* International Paper Co. v. F.P.C., Civ. No. 69–5169 (S.D.N.Y., May 15, 1970) (typewritten opinion at 12–13) (staff of FPC is not a separate agency) (unreported; typewritten opinion filed in this action in the District Court, Civ. No. 1571–70, D.D.C.).

17. The statutory definition of "agency" specifically excludes Congress and the courts of the United States, but does not specifically exclude the President. 5 U.S.C. § 551(1) (Supp. V, 1970).

18. *See* Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 499–501, 18 L.Ed. 437 (1867).

policies in science and technology.[19] Its functions had previously been assigned to the National Science Foundation,[20] but the President found that arrangement unsatisfactory:[21]

[T]he Foundation, being at the same organizational level as other agencies, cannot satisfactorily coordinate Federal science policies or evaluate programs of other agencies. Science policies, transcending agency lines, need to be coordinated and shaped at the level of the Executive Office of the President drawing upon many resources both within and outside of government. Similarly, staff efforts at that higher level are required for the evaluation of Government programs in science and technology.

The President therefore proposed a reorganization plan that transferred certain functions to an administrative unit "outside the White House Office, but in the Executive Office of the President on roughly the same basis as the Budget Bureau, the Council of Economic Advisors, the National Security Council, and the Office of Emergency Planning."[22]

A reorganization plan proposed by the President can take effect only if both houses of Congress acquiesce, i. e., if neither house passes a resolution disapproving the plan within a fixed period of time.[23] The congressional understanding of a proposed plan is therefore entitled to considerable weight in determining its effect. The one house of Congress that explicitly considered the plan creating the OST[24] clearly contemplated that the OST would function as a distinct entity and not merely as part of the President's staff. The House Committee on Government Operations stated:[25]

Heretofore, the Congress has not been able to obtain adequate information on Government-wide science matters because the President's Special Assistant for Science has been unavailable for questioning by congressional committees due to his confidential relationship with the President. We express no opinion here on the merits

19. Reorganization Plan No. 2 of 1962, Pt. I, § 3, 3 C.F.R. 879, 879–80 (1959–63 Compilation), set out following 5 U.S.C. § 133z–15 (1964), at 247.

20. National Science Foundation Act of 1950, ch. 171, § 3(a) (1) & (6), 64 Stat. 149, as amended, 42 U.S.C. § 1862(a) (1) & (6) (1964) ; see Exec. Order No. 10,521, 3 C.F.R. 183 (1954–58 Compilation), 42 U.S.C. § 1862 (1964), as amended by Exec. Order No. 10,807, § 6(b), 3 C.F.R. 329, 331 (1959–63 Compilation), 42 U.S.C. § 1862 (1964).

21. Message from the President of the United States Transmitting Reorganization Plan No. 2 of 1962, Providing for Certain Reorganizations in the Field of Science and Technology, H.R.Doc.No.372, 87th Cong., 2d Sess. (1962), reproduced in 108 Cong.Rec. 5439–5440, 5456–5457 (1962). See also H.R.Rep.No.34, 90th Cong., 1st Sess. 6 (1967) ; S.Rep.No. 1137, 90th Cong., 2d Sess. 7 (1968).

22. H.R.Rep.No.1635, 87th Cong., 2d Sess. 9 (1962), quoting Hearings on Reorganization Plan No. 2 of 1962 Before the Subcomm. on Executive and Legislative Reorganization of the House Comm. on Gov't Operations, 87th Cong., 2d Sess. 11 (1962) (statement of Elmer B. Staats, Deputy Director, Bureau of the Budget). See also 108 Cong.Rec. 8469, 8471–8472 (1962) (remarks of Reps. Anderson and Monagan). In 1968, the National Science Foundation Act of 1950 was amended to reflect the new distribution of functions. Pub.L.No. 90–407, 82 Stat. 360 (1968), 42 U.S.C. § 1862(a) (5) & (d) (Supp. V, 1970) ; see H.R.Rep.No.34, 90th Cong., 1st Sess. 6, 21 (1967) ; S.Rep.No.1137, 90th Cong., 2d Sess. 7, 16 (1968). The Director of the OST was also expected to replace the President's Special Assistant for Science and Technology in the capacity of personal adviser to the President on scientific matters. See H.R.Rep.No. 1635, supra, at 5 ; Hearings, supra, at 10–11, 13–15.

23. Reorganization Act of 1949, ch. 226, § 6, 63 Stat. 205, as amended, 5 U.S.C. § 906 (Supp. V, 1970).

24. A resolution disapproving the plan which created the OST was introduced in the House of Representatives, but did not pass. H.R.Res. 595, 87th Cong., 2d Sess. (1962) ; 108 Cong.Rec. 8473 (1962).

25. H.R.Rep.No.1635, 87th Cong., 2d Sess. 9 (1962).

of this reasoning but this committee's position on excessive invocation of executive privilege is well known. With the creation of the new office the Director will become available to Congress and provide us with more information than we now obtain.

A Congressman commenting on the plan emphasized the same point: [26]

> With an Office established by the reorganization plan, and a Director and Deputy Director to head it, congressional committees will be able to deal with this organization on the same basis as they do with the Bureau of the Budget and the Council of Economic Advisers. We will have a responsible officer to whom we can direct inquiries, and whom we can summon to committees to give testimony on subjects of the greatest national importance.

If the OST's sole function were to advise and assist the President, that might be taken as an indication that the OST is part of the President's staff and not a separate agency. In addition to that function, however, the OST inherited from the National Science Foundation the function of evaluating federal programs. When Congress initially imposed that duty on the Foundation, it was delegating some of its own broad power of inquiry [27] in order to improve the information on federal scientific programs available to the legislature. When the responsibility for program evaluation was transferred to the OST, both the executive branch and members of Congress contemplated that Congress would retain control over information on federal programs accumulated by the OST, despite any confidential relation between the Director of the OST and the President—a relation that might result in the use of such information as a basis for advice to the President.[28] By virtue of its independent function of evaluating federal programs, the OST must be regarded as an agency subject to the APA and the Freedom of Information Act.

Moreover, the OST's interpretation of its own charter in 1967 lends additional support to the conclusion that it is a separate administrative entity.[29] At that time, the OST apparently considered itself an agency subject to the APA, for it published a notice in the Federal Register describing the information available to the public from the OST under the new Freedom of Information Act, and setting forth procedures for obtaining that information.[30]

Having concluded that the OST is an agency, we think it clear that the Garwin Report is a record of that agency for purposes of a suit under the Freedom of Information Act. The function of the OST is to evaluate feder-

---

26. 108 Cong.Rec. 8473 (1962) (statement of Rep. Holifield). *See also id.* at 8472 ("I think the very fact that this makes the scientific program more answerable to the Congress in itself justifies the establishment of this Office * * *.") (remarks of Rep. Holifield).

27. The power of investigation has long been recognized as an incident of legislative power necessary to the enactment and effective enforcement of wise laws. *See, e. g.,* McCrain v. Daugherty, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927). The chief limitation on congressional inquiry is that it must be exercised for valid legislative purposes and not in derogation of fundamental personal liberties. *See, e. g.,* Watkins v. United States, 354 U.S. 178, 187, 198, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957). Congress has often delegated portions of its investigatory power to administrative agencies. *See* 1 K. Davis, Administrative Law Treatise §§ 3.01–3.14 (1958, Supp.1970).

28. *See* Hearings, *supra* note 22, at 13–14 (remarks of Elmer B. Staats, Deputy Director, Bureau of the Budget, and of Reps. Anderson and Holifield).

29. *See* Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) :

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.

30. 32 Fed.Reg. 11,060 (1967).

al scientific programs.[31] Consequently, any report prepared by the agency or its consultants in fulfillment of that function must be regarded as a record of the agency. It is true that the SST program was selected for evaluation because the President had requested an assessment of it. That request may bring the document within a statutory or constitutional exemption from the disclosure requirements of the Act.[32] But the request does not deprive the Garwin Report of its character as the record of a study made in the performance of the ordinary functions of the agency.

## II

The conclusion that the Garwin Report is an agency record is only the beginning of the inquiry required under the Freedom of Information Act. The Act enumerates nine specific exemptions to its general requirement of disclosure.[33] On remand, the trial court must determine whether any of those exemptions is applicable.

■ It has been argued that courts may recognize other grounds for nondisclosure, apart from the statutory exemptions. At least one court has held that the Act's grant of "jurisdiction to enjoin" improper withholding of agency records leaves district courts with discretion to deny relief on general equitable grounds, even when no exemption is applicable.[34] But Congress clearly has the power to eliminate ordinary discretionary barriers to injunctive relief, and we believe that Congress intended to do so here.[35]

■ Prior to the Freedom of Information Act, the disclosure provisions of the APA allowed the agencies to withhold information "in the public interest," or "for good cause shown," or on the ground that the person seeking the record was not "properly and directly concerned." [36] The chief purpose of the new Act was to increase public access to governmental records by substituting limited categories of privileged material for these discretionary standards, and providing an effective judicial remedy.[37]

---

31. The Garwin Report is precisely the sort of evaluation the OST is authorized to undertake, *i. e.*, an evaluation of another agency's scientific program involving technological developments and applications. The National Science Foundation, focusing its effort on basic science, had not gathered much information on technological applications and developments, nor had it studied agency programs. The Foundation's function of evaluating federal programs was transferred to the OST to improve performance in these very respects. *See* Message From the President of the United States Transmitting Reorganization Plan No. 2 of 1962, Providing for Certain Reorganizations in the Field of Science and Technology, H.R.Doc.No. 372, 87th Cong., 2d Sess. (1962), reproduced in 108 Cong.Rec. 5439–5440, 5456–5457 (1962); H.R.Rep.No.1635, 87th Cong., 2d Sess. 7–8 (1962).

32. *See* pp. 1077–1078 *infra*.

33. 5 U.S.C. § 552(b) (1)–(9) (Supp. V, 1970).

34. Consumers Union of the United States, Inc. v. Veterans Administration, 301 F. Supp. 796, 806–808 (S.D.N.Y.1969); *see* General Services Administration v. Ben-

son, 415 F.2d 878, 880 (9th Cir. 1969). *See generally* 1 K. Davis, Administrative Law Treatise § 3A.6 (Supp.1970).

35. *Compare* United Steelworkers v. United States, 361 U.S. 39, 55–59, 80 S.Ct. 1, 4 L.Ed.2d 12 (1959) (Frankfurter, J., concurring) (80-day injunction against strike causing national emergency is mandatory), *with* Hecht Co. v. Bowles, 321 U.S. 321, 326–331, 64 S.Ct. 587, 88 L.Ed. 754 (1944) (injunction against violation of Emergency Price Control Act is discretionary). *See* Note, Judicial Discretion and the Freedom of Information Act: Disclosure Denied: Consumers Union v. Veterans Administration, 45 Ind.L.J. 421 (1970). It is well established that Congress may modify the usually strict standards for equitable relief in providing for injunctions in aid of important federal policies. *See, e. g.,* Virginia Ry. v. System Fed'n. No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

36. 5 U.S.C. § 1002 (1964).

37. 5 U.S.C. § 552 (Supp. V, 1970); *see* Bristol-Myers Co. v. FTC, 138 U.S.App. D.C. 22, 25, 424 F.2d 935, 938 (1970); American Mail Line, Ltd. v. Gulick, 133

The Act rejects the usual principle of deference to administrative determinations by requiring a trial "de novo" in the district court. By directing disclosure to any person, the Act precludes consideration of the interests of the party seeking relief. Most significantly, the Act expressly limits the grounds for non-disclosure to those specified in the exemptions.[38] Through the general disclosure requirement and specific exemptions, the Act thus strikes a balance among factors which would ordinarily be deemed relevant to the exercise of equitable discretion, i. e., the public interest in freedom of information and countervailing public and private interests in secrecy. Since judicial use of traditional equitable principles to prevent disclosure would upset this legislative resolution of conflicting interests, we are persuaded that Congress did not intend to confer on district courts a general power to deny relief on equitable grounds apart from the exemptions in the Act itself.[39] There may be exceptional circumstances in which a court could fairly conclude that Congress intended to leave room for the operation of limited judicial discretion, but no such circumstance appears in the present record of this case.

Thus, unless the Government on remand makes a valid claim of constitutional privilege, it will be able to prevent disclosure only by showing that the Garwin Report falls within one or more of the statutory exemptions.

On the basis of the present record, the exemption which seems most likely to be relevant is the fifth, protecting "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other that an agency in litigation with the agency."[40] That exemption was intended to encourage the free exchange of ideas during the process of deliberation and policy-making; accordingly, it has been held to protect internal communications consisting of advice, recommendations, opinions, and other material reflecting deliberative or policy-making processes, but not purely factual or investigatory reports.[41] Factual information may be

U.S.App.D.C. 382, 385, 411, F.2d 696, 699 (1969); H.R.Rep.No.1497, 89th Cong., 2d Sess. 1–2, 5–6, 8–9, 11 (1966); S.Rep.No.813, 89th Cong., 1st Sess. 3–6, 8, 10 (1965).

38. This section does not authorize withholding information or limit the availability of records to the public, except as specifically stated in this section. 5 U.S.C. § 552(c) (Supp. V, 1970); see Epstein v. Resor, 421 F.2d 930, 932 (9th Cir.), cert. denied, 398 U.S. 965, 90 S.Ct. 2176, 26 L.Ed.2d 549 (1970).

39. One statement in the report of the Senate Committee on the Judiciary specifically supports the conclusion that Congress intended to eliminate equitable discretion. S.Rep.No.813, 89th Cong., 1st Sess. 3 (1965) ("It is essential that agency personnel, and the courts as well, be given definitive guidelines in setting information policies.") (emphasis added). The report of the House Committee on Government Operations contains language indicating that district courts do have discretion. H.R.Rep.No.1497, 89th Cong., 2d Sess. 9 (1966) ("The Court will have authority whenever it considers such action equitable and appropriate to enjoin

the agency from withholding its records and to order the production of agency records improperly withheld.") (Emphasis added.) However, the House report was published after the Senate had passed its bill. Since only the Senate report was considered by both houses of Congress, the Senate Committee's reading of the Act is a better indication of legislative intent when the two reports conflict. See Consumers Union of the United States, Inc. v. Veterans Administration, 301 F.Supp. 796, 801 (S.D.N.Y.1966); Benson v. General Services Administration, 289 F.Supp. 590, 595 (W.D.Wash. 1968), aff'd on other grounds, 415 F.2d 878 (9th Cir. 1969); 1 K. Davis, Administrative Law Treatise § 3A.2 (Supp. 1970).

40. 5 U.S.C. § 552(b) (5) (Supp. V, 1970).

41. See Grumman Aircraft Eng'r Corp. v. Renegotiation Bd., 138 U.S.App.D.C. 147, 151, 425 F.2d 578, 582 (1970); Bristol-Myers Co. v. F.T.C., 138 U.S.App.D.C. 22, 26, 424 F.2d 935, 939 (1970); see H.R. Rep.No.1497, 89th Cong., 2d Sess. 10 (1966); S.Rep.No.813, 89th Cong., 2d Sess. 9 (1965). See also Freeman v. Seligson, 132 U.S.App.D.C. 56, 68–69, 405

protected only if it is inextricably intertwined with policy-making processes.[42] Thus, for example, the exemption might include a factual report prepared in response to specific questions of an executive officer, because its disclosure would expose his deliberative processes to undue public scrutiny. But courts must beware of "the inevitable temptation of a governmental litigant to give [this exemption] an expansive interpretation in relation to the particular records in issue." [43]

■ The OST is specifically authorized by Congress to evaluate federal scientific programs in order to provide Congress and the President with better information. Its evaluations may be useful to the President, the Congress, and other agencies with the power to make science policy. Nevertheless, the evaluations themselves may not reflect the internal policy deliberations that the "internal communications" privilege is designed to protect. The Garwin Report may con-

tain some policy advice and recommendations which are protected by the statutory exemption.[44] In the present record, however, there is no evidence to indicate that releasing the factual information in the Garwin Report will expose the decisional processes of the President or other executive officers with policy-making functions. Unless the Government introduces such evidence on remand, the factual information in the Report will not be protected by the exemption for internal communications.

■ Another statutory exemption which may be applicable to the Garwin Report is the fourth, protecting "trade secrets and commercial or financial information obtained from a person and privileged or confidential." [45] This exemption is intended to encourage individuals to provide certain kinds of confidential information to the Government, and it must be read narrowly in accordance with that purpose.[46] If the Garwin Report contains material protected by

---

F.2d 1326, 1338–1339 (1968) ; Machin v. Zuckert, 114 U.S.App.D.C. 335, 338–340, 316 F.2d 336, 339–341 (1962), cert. denied, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed. 2d 124 (1963) ; Boeing Airplane Co. v. Coggeshall, 108 U.S.App.D.C. 106, 112, 280 F.2d 654, 660 (1960) ; note 42 *infra*.

42. *Cf.* United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) ; Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 82 L.Ed. 1129 (1938) ; Carl Zeiss Stifting v. V. E. B. Carl Zeiss, Jena, 40 F.R.D. 318, 325–326 (D.D.C.1966), aff'd per curiam, 128 U.S. App.D.C. 10, 384 F.2d 979, cert. denied, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967).

43. Ackerly v. Ley, 137 U.S.App.D.C. 133, 138, 420 F.2d 1336, 1341 (1969).

44. The rationale of the exemption for internal communications indicates that the exemption should be available in connection with the Garwin Report even if it was prepared for an agency by outside experts. The Government may have a special need for the opinions and recommendations of temporary consultants, and those individuals should be able to give their judgments freely without fear of publicity. A document like the Garwin Report should therefore be treated as an intra-agency

memorandum of the agency which solicited it.

45. 5 U.S.C. § 552(b) (4) (Supp. V, 1970). Other statutory exemptions also protect information that might be communicated to the Government on a confidential basis. The Act exempts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," and matters "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions." *Id.*, § 552(b) (6) & (8). The Act also exempts "investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency." *Id.*, § 552(b) (7). This exemption covers files prepared for both civil and criminal law enforcement. *See* Clement Bros. v. N. L. R. B., 282 F. Supp. 540, 542 (N.D.Ga.1968).

46. *See* H.R.Rep.No.1497, 89th Cong., 2d Sess., 10 (1966) ; S.Rep.No.813, 89th Cong., 1st Sess. 9 (1965) ; Grumman Aircraft Eng'r Corp. v. Renegotiation Bd., 138 U.S.App.D.C. 147, 151, 425 F.2d 578, 582 (1970) ; Bristol-Myers Co. v. F. T. C., 138 U.S.App.D.C. 22, 25–26, 424 F.2d 935, 938–939 (1970) ; Consumers Union

this exemption, then that material should be deleted before disclosure of the remainder may be required.[47]

■ Finally, the trial court on remand may be called upon to consider the first exemption for matters "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy." [48]

■ Under the Freedom of Information Act, the District Court is required to expedite the proceedings on remand to determine whether the Garwin Report is protected by any statutory exemption or constitutional privilege.[49] The court can

most effectively undertake the statutory de novo evaluation of the Government's claim by examining the Report *in camera*. Since the record indicates that the Report is an evaluation of the federal program for development of the SST, it seems likely that the Report contains factual information on the SST and on the Government's activities with respect to it. If the Government asserts a specific privilege on remand, inspection of the Report will enable the court to delete any privileged matter, so that the remainder may be disclosed in accordance with the policies of the Act.[50] Even

of the United States, Inc. v. Veterans Administration, 301 F.Supp. 796, 802–804 (S.D.N.Y.1969). *See also* Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) (identity of informers) ; In re Quarles & Butler, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895) ; Vogel v. Gruaz, 110 U.S. 311, 4 S.Ct. 12, 28 L.Ed. 158 (1884) ; Freeman v. Seligson, 132 U.S.App.D.C. 56, 69–70, 405 F.2d 1326, 1339–1340 (1968) ; Westinghouse Elec. Corp. v. City of Burlington, 122 U.S.App.D.C. 65, 70–74, 351 F.2d 762, 767–771 (1965) ; Boeing Airplane Co. v. Coggeshall, 108 U.S.App.D.C. 106, 113, 280 F.2d 654, 661 (1960) ; Arnstein v. United States, 54 App.D.C. 199, 203–204, 296 F. 946, 950–951 (1924).

47. The exemption for confidential information is available only with respect to information received from sources outside the Government. The Garwin panel's Report is therefore eligible for this exemption only to the extent it contains private information given confidentially by panel members or information obtained from nongovernmental parties on a confidential basis. *See* Grumman Aircraft Eng'r Corp. v. Renegotiation Bd., 138 U.S.App.D.C. 147, 151, 425 F.2d 578, 582 (1970) ; Consumers Union of the United States, Inc. v. Veterans Administration, 301 F.Supp. 796, 802–804 (S.D.N.Y.1969).

48. 5 U.S.C. § 552(b) (1) (Supp. V, 1970). The other exemptions require a de novo determination of whether the record the Government seeks to withhold contains information of the class protected by an exemption. But to qualify for the first exemption, the Government need show only that the record is "specifically required * * * to be kept secret" pursuant to an Executive order; review of the propriety of keeping it secret is then

limited to determining that the administrative decision was not arbitrary and capricious. *See* Epstein v. Resor, 421 F.2d 930, 933 (9th Cir.), cert. denied, 398 U.S. 965, 90 S.Ct. 2176, 26 L.Ed.2d 549 (1970). *See also* United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953) ; Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875) ; *cf.* Dayton v. Dulles, 102 U.S.App.D.C. 372, 378, 254 F.2d 71, 77 (1957), rev'd on other grounds, 357 U.S. 144, 78 S.Ct. 1127, 2 L.Ed.2d 1221 (1958).

49. Except as to causes the court considers of greater importance, proceedings before the district court, as authorized by this paragraph, take precedence on the docket over all other causes and shall be assigned for hearing and trial at the earliest practicable date and expedited in every way.
5 U.S.C. § 552(a) (3) (Supp. V, 1970).

50. *See* Grumman Aircraft Eng'r Corp. v. Renegotiation Bd., 138 U.S.App.D.C. 147, 150, 425 F.2d 578, 581 (1970). *See also* Boeing Airplane Co. v. Coggeshall, 108 U.S.App.D.C. 106, 114, 280 F.2d 654, 662 (1960) :
In the present case, where no military or state secrets are involved, and where the generally meritorious basis of the subpoena—including necessity—has been established, we think it proper for the District Judge to examine *in camera* the individual papers which are alleged to be privileged, and direct exclusions or excisions in a manner deemed lawful and appropriate, keeping in mind the issues of the case, the nature and importance of the interests supporting the claim of privilege, and the fundamental policy of free societies that justice is usually promoted by disclosure rather than secrecy. [citations omitted]

if the Government asserts that public disclosure would be harmful to the national defense or foreign policy, *in camera* inspection may be necessary. In such a case, however, the court need not inspect the Report if the Government describes its relevant features sufficiently to satisfy the court that the claim of privilege is justified.[51]

### III

Congress passed the Freedom of Information Act in response to a persistent problem of legislators and citizens, the problem of obtaining adequate information to evaluate federal programs and formulate wise policies. Congress recognized that the public cannot make intelligent decisions without such information, and that governmental institutions become unresponsive to public needs if knowledge of their activities is denied to the people and their representatives. The touchstone of any proceedings under the Act must be the clear legislative intent to assure public access to all governmental records whose disclosure would not significantly harm specific governmental interests. The policy of the Act requires that the disclosure requirement be construed broadly, the exemptions narrowly.

The public's need for information is especially great in the field of science and technology, for the growth of specialized scientific knowledge threatens to outstrip our collective ability to control its effects on our lives. The OST itself was created to help alleviate this problem; Congress intended that the OST would provide better information and coordination with respect to federal activities in the scientific field. It would defeat the purposes of the OST, as well as the purposes of the Act, to withhold from the public factual information on a federal scientific program whose future is at the center of public debate.

Reversed and remanded for further proceedings in accordance with this opinion.

WILKEY, Circuit Judge (concurring):

I concur in the result reached and in the court's opinion, except on the point of equitable discretion discussed below.

### I.

It is necessary to remand this matter to the trial court, because the trial court did err in not holding the Garwin Report a record of an agency subject to the Freedom of Information Act, and therefore quite logically did not proceed to consider the exemptions under that Act.

### II.

Conceivably on remand the trial court may also reach a question of constitutional privilege.[1] To put this question in perspective, it must be understood that the privilege against disclosure of the decision-making process is a tripartite privilege, because precisely the same privilege in conducting certain aspects of public business exists for the legislative and judicial branches as well as for the executive. It arises from two sources, one common law and the other constitutional.

Historically, and apart from the Constitution, the privilege against public disclosure or disclosure to other coequal branches of the Government arises from the common sense-common law principle that not all public business can be transacted completely in the open, that public officials are entitled to the private advice of their subordinates and to confer among themselves freely and frankly, without fear of disclosure, otherwise the

---

51. *See* United States v. Reynolds, 345 U.S. 1, 8–10, 73 S.Ct. 528, 97 L.Ed. 727 (1953) ; Epstein v. Resor, 421 F.2d 930, 933 (9th Cir), cert. denied, 398 U.S. 965, 90 S.Ct. 2176, 26 L.Ed.2d 549 (1970).

1. Although the trial court cited this as a second ground of its ruling, this issue has not been raised by the Government.

advice received and the exchange of views may not be as frank and honest as the public good requires.

No doubt all of us at times have wished that we might have been able to sit in and listen to the deliberation of judges in conference, to an executive session of a Congressional committee or to a Cabinet meeting in order to find out the basis for a particular action or decision. However, Government could not function if it was permissible to go behind judicial, legislative or executive action and to demand a full accounting from all subordinates who may have been called upon to make a recommendation in the matter. Such a process would be self-defeating. It is the President, not the White House staff, the heads of departments and agencies, not their subordinates, the judges, not their law clerks, and members of Congress, not their executive assistants, who are accountable to the people for official public actions within their jurisdiction. Thus, whether the advice they receive and act on is good or bad there can be no shifting of ultimate responsibility.[2]

Insofar as the executive branch is concerned, most, if not all, of the information protected by this common law privilege is now covered by the fifth exemption to the Freedom of Information Act which exempts from disclosure "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." [3]

The constitutional part of the privilege arises from the principle of the separation of powers among the legislative, executive and judicial branches of our Government. This at first glance may not seem relevant here, where the appellants are private citizens relying on the Freedom of Information Act, but it puts the matter in a different focus to

know that originally Congressman Henry S. Reuss had sought to obtain this Report over a period of months. Whatever justification lies behind the refusal of his request has a bearing on appellants' rights here. Only after both Dr. DuBridge and Mr. Ehrlichman, Assistant to the President, had declined to accede to the Congressman's request—on the ground that "the report was in the nature of inter- and intra-agency memoranda which contained opinions, conclusions and recommendations prepared for the advice of the President"—did the appellants make their request.

Appellants invoked the Freedom of Information Act in support of their request, but as the court's opinion points out—without deciding whether the refusal of the Assistant to the President was justified or not—" * * * while his [Mr. Reuss'] right as a citizen to obtain the Report under the Act is equal to that of appellants, his right as a Congressman is presumably greater" (footnote 6). Obviously Congress could not surmount constitutional barriers—if such exist in this or any other given case—by conferring upon any member of the general public a right which Congress, neither individually nor collectively, possesses. Water does not naturally rise higher than its source.

Recognition of the necessity, on both grounds cited above, of preserving the confidentiality of certain papers and deliberations has come from all three branches of our Government. A few examples demonstrate the universality and antiquity of the principles involved here.

While the constitutional privilege has been asserted most frequently in our history by the executive against the demands of the legislature, yet the Congress itself has always recognized a privilege for its own private papers and deliberations. Not only is there no provision or procedure for a demand by a

2. Rogers, The Right to Know Government Business From the Viewpoint of the Government Official, 40 Marq.L.Rev. 83, 89 (1956). *See generally*, Kramer and

Marcuse, Executive Privilege—A Study of the Period 1953–1960, 29 Geo.Wash. L.Rev. 623 (1961).

3. 5 U.S.C. § 552(b) (5) (Supp. V, 1970).

private citizen for access to any papers deemed confidential, but no court subpoena is complied with by the Congress or its committees without a vote of the house concerned to turn over the documents willingly in response to the request of the court, thus properly preserving the co-equal separate status of that branch of the Government. For example,

> [N]o evidence of a documentary character under the control and in the possession of the House of Representatives can, by the mandate of process of the ordinary courts of justice, be taken from such control or possession but by its permission.[4]

The judiciary, as perhaps inherently the weakest of the three branches, has most frequently reiterated the principle of separation of powers, the classic expression being in Kilbourn v. Thompson:

> It is * * * essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other.[5]

The reason for the separation of powers was well put by Mr. Justice Brandeis:

> The doctrine of the separation of powers was adopted by the convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid

friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments to save the people from autocracy.[6]

When President Washington first declined to furnish the House of Representatives with a document requested by it, he gave as his reason for refusal,

> [I]t is essential to the due administration of the Government that the boundaries fixed by the Constitution between the different departments should be preserved, a just regard to the Constitution and to the duty of my office, under all the circumstances of this case, forbids a compliance with your request.[7]

These examples of recognition by all three branches of a constitutional privilege to withhold certain documents under given circumstances not only show the tripartite nature of the constitutional privilege, but are relevant here, where the appellants are private citizens, because the original request for the Garwin Report stemmed from a Congressman and was denied by the executive on grounds the validity of which is not yet finally determined. But it would be an absurdity to contend that a Congressman—who is both citizen and Member of the House of Representatives—could not have access to a document in the executive branch, and yet another citizen could gain access on the strength of a statute enacted by Congress. Thus, if the exemptions to the Freedom of Information Act are found not to permit withholding of the information sought here, the exec-

---

4. H.R.Res. 427, 81st Cong., 2d Sess., 96 Cong.Rec. 565–66 (1950) ; *see* H.R.Res. 460, 81st Cong., 2d Sess., 96 Cong.Rec. 1400 (1950) ; H.R.Res. 465, 81st Cong., 2d Sess., 96 Cong.Rec. 1695 (1950) ; H.R.Res. 469, 81st Cong., 2d Sess., 96 Cong.Rec. 1765 (1950). Only recently, in a situation substantially the inverse of the present case, *i. e.*, a suit to *suppress* publication of congressional documents, the House indicated its displeasure with, and asserted its independence from what it deemed an intrusion by the ju-

diciary into its prerogatives with respect to its own documents. See Hentoff v. Ichord, 318 F.Supp. 1175 (D.D.C.1970), and H.R.Res. 1306, 91st Cong., 2d Sess., 116 Cong.Rec.H 11606, 11625 (daily ed. 14 Dec. 1970).

5. 103 U.S. 168, 191, 26 L.Ed. 377 (1880).

6. Myers v. United States, 272 U.S. 52, 293, 47 S.Ct. 21, 81, 71 L.Ed. 160 (1926) (dissenting opinion).

7. 1 Richardson, Messages and Papers of the Presidents 196 (1896).

utive may still assert a constitutional privilege on the ground that Congress may not compel by statute disclosure of information which it would not be entitled to receive directly upon request.

Part II of the court's opinion also expresses the view that Congress, in providing for *de novo* court review of agency refusals to disclose information, intended to *require* the courts to enjoin withholding of any agency record not exempted by the Act and not protected by a constitutional privilege. Congress, the opinion states, "did not intend to confer on district courts a general power to deny relief on equitable grounds apart from the exemptions in the Act itself." This quoted statement and related discussion relate to an issue which is not presented for decision in this case and is not likely to face the trial court on remand. There is no suggestion in the record that the District Court here denied relief on equitable grounds, nor is it likely that such grounds could be presented in the context of this case. It has been suggested that a court may, on equitable grounds, decline to require disclosure of records not covered by a specific exemption in the Act, where to order disclosure would irreparably invade personal privacy or cause the Government to violate an agreement with a private party that non-commercial and non-financial [8] information provided by him will be kept confidential.[9] There do not appear to be such equitable grounds for non-disclosure present in the instant case and I would not therefore reach the difficult question of statutory construction of the District Court's power in such circumstances.

The Act itself merely provides: "On complaint, the district court * * * *has jurisdiction to enjoin* the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." [10] It does not in terms require that such jurisdiction be exercised in all cases. The legislative history pulls in opposite directions on this question; the Senate Report states:

> It is the purpose of this [Act] to * * * establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language. * * * It is essential that agency personnel, *and the courts as well, be given definite guidelines* in setting information policies. Standards such as "for good cause" are certainly not sufficient.[11]

The House Report, on the other hand, relates that under the Act:

> The Court will have authority *whenever it considers such action equitable and appropriate* to enjoin the agency from withholding its records and to

---

8. The fourth exemption of the Freedom of Information Act exempts from disclosure "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552 (b) (4) (Supp. V, 1970).

9. Davis, The Information Act: A Preliminary Analysis, 34 U.Chi.L.Rev. 761, 767, 787, 791, 802 (1967).

10. 5 U.S.C. 552(a) (3) (1967). In Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944), the statute involved directed that upon complaint of the administrator of the Emergency Price Control Act an injunction *"shall be granted."* Nevertheless the Supreme Court held that the District Court could decline to issue an injunction if equitable considerations indicated that to be the appropriate result. Contrarily, in United Steelwork-ers v. United States, 361 U.S. 39, 80 S.Ct. 1, 4 L.Ed.2d 12 (1959), the Court impliedly held that under a statute which provided that the District Court *"shall have jurisdiction"* to enjoin an industry-wide strike causing a national emergency, the trial judge had no equitable discretion to refuse to issue an injunction. (That conclusion was made explicit in the concurring opinion of Justices Frankfurter and Harlan.) The accommodation of these two precedents and their application to the statutory scheme of the Freedom of Information Act are, in my view, best accomplished in the context of a case where the issue is presented by the facts and argued by the parties.

11. S.Rep.No.813, 89th Cong., 1st Sess. 3 (1965).

order the production of agency records improperly withheld.[12]

And a noted commentator has expressed the view that the denial of relief on equitable grounds is an appropriate course in certain circumstances.[13]

There is, no doubt, force to the majority's opinion that the thrust of the Act is to limit the grounds for agency withholding to the exemptions therein stated, and that the discretion of the court in enforcing the Act should thus be similarly curtailed. Nevertheless, because of the conflicting legislative history and the difficulty in determining congressional intent on this matter, I believe that pursuant to sound principles of judicial decision making, decision of this issue can and should await the case where it is squarely raised. I therefore express no view as to the correctness of the majority's suggestion that the courts are generally without equitable power to decline to order production of agency records in cases not specifically covered by exemption.

### III.

Part III of the court's opinion is a summary of the laudable objectives of the Freedom of Information Act of assuring public access to information necessary to making informed decisions on public issues, but I respectfully suggest it is nevertheless unessential to our decision here. Since it forms part of the court's opinion, however, I think it should be made clear that neither the public nor the Congress is being denied *the facts* here in regard to the supersonic transport, and therefore recourse to legal action under the Freedom of Infor-

mation Act as a practical matter was simply unnecessary.

Each of the persons who were asked by Dr. DuBridge to form the *ad hoc* panel to prepare the Report for the President could be called before the appropriate congressional committee and asked for his views on any aspect of the SST program. There is no reason why the views of these scientists and engineers cannot be made available to the Congress and to the public. The only matter about which they should not be asked is exactly what advice they gave the President. Furthermore, almost two years have gone by since they expressed their views to the President, and the opinions which they might now give to the Congress or to the public, in the light of additional information obtained, might be somewhat different from their best advice at the time they helped formulate the Garwin Report. Even without an appearance before a congressional committee any one of several of these scientists or engineers could be interviewed by the press or on TV, invited to write an article for a magazine or newspaper, or participate in public discussion in any form, in order to enlighten the public. There would be nothing improper in a public expression of individual opinion, so long as exactly what the person advised the President was not explicated.

As a matter of recorded fact, Dr. Richard Garwin, who chaired the panel, has done just that. He has appeared before *three* different congressional committees,[14] and has been publicly reported as stating that he had "said everything I have to say" in lengthy critical testimony about the SST before the three committees, although he appears to have

12. H.R.Rep.No.1497, 89th Cong., 2d Sess. 9 (1966).

13. Davis, *supra*, note 9.

14. Hearings on H.R. 17755 Before the Subcomm. of the Senate Committee on Appropriations, 91st Cong., 2d Sess., pt. 2, at 1621 (1970); Hearings on Supersonic Transport Development Before the Subcomm. on Economy in Government

of the Joint Economic Comm., 91st Cong., 2d Sess., pt. 4, at 904, 908 (1970); Hearings on Department of Transportation Appropriations Before the Subcomm. on Dept. of Transportation and Related Agencies Appropriations of the House Comm. on Appropriations, 91st Cong., 2d Sess., pt. 3 (Testimony of Members of Congress and Interested Individuals and Organizations) at 980 (1970).

carefully refrained from discussing the Garwin Report itself.[15]

Thus it appears that alternate means of obtaining the facts in regard to the SST, other than a lawsuit to compel production of the Garwin Report, are available both to the public and to Congress.[16] This hints at the possibility that what the appellants are seeking here is really the *advice* given the President of the United States by his subordinates, rather than the *facts* in regard to the SST program on which the public and the Congress can form an intelligent judgment. Viewed in this light, the issues may take on a different aspect from those framed by the appellants.

---

15. Dr. Garwin, at least, was interviewed by the Saturday Review, The Washington Post, and very likely a number of other media representatives. *See* Sutton, Is the SST Really Necessary, Saturday Review, 15 Aug. 1970, at 14; Washington Post, 21 Dec. 1970, § A, at 2. According to the latter report:

Garwin said he still did not feel free to discuss the study [made by the *ad hoc* panel at the request of the OST] itself, but he emphasized that he "said everything I have to say" about the SST in the course of critical testimony this year before three congressional committees.

These reports of Dr. Garwin's interviews with the press were quoted and discussed on the Senate Floor. *See* 116 Cong.Rec. S 20921, S 20932 (daily ed. 21 Dec. 1970).

16. Of course these considerations would not apply to personal advisors to the President such as members of the White House staff, who traditionally do not appear before Congress. But, as the court's opinion indicates, Dr. Garwin and his confreres, operating under the direction of the OST, are not thus restricted.