Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued  January  22,  2004          Decided  May  7,  2004

No. 03-5093

JUDICIAL WATCH, INC.,
APPELLANT

v.

DEPARTMENT OF JUSTICE,
APPELLEE

———

Consolidated with
No. 03-5094

———

Appeals from the United States District Court
for the District of Columbia
(No. 01cv00639)
(No. 01cv00720)

———

*Paul J. Orfanedes* argued the cause and filed the briefs for appellant.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Michael E. Tankersley* was on the brief for *amicus curiae* George Lardner in support of appellant.

*Mark B. Stern*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, *Roscoe C. Howard, Jr.*, U.S. Attorney, *Gregory G. Katsas*, Deputy Assistant Attorney General, and *Michael S. Raab*, Attorney.

Before: HENDERSON, RANDOLPH and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Dissenting opinion filed by *Circuit Judge* RANDOLPH.

ROGERS, *Circuit Judge*: In *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997), the court, in considering a grand jury subpoena for White House documents relating to an investigation of the former Secretary of Agriculture, reviewed the history of the executive privilege doctrine, and the nature and principles underlying two privileges falling within that doctrine. We apply that analysis in deciding whether, under Exemption 5 of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(5), the presidential communications privilege extends into the Justice Department to internal pardon documents in the Office of the Pardon Attorney and the Office of the Deputy Attorney General that were not "solicited and received," *id.* at 752, by the President or the Office of the President.[1] In refusing to release certain documents in re-

---

[1] The Office of the President, as relevant to the issues in this appeal, is distinct from the Executive Office of the President and is a smaller unit comprised of such immediate advisers as the Chief of Staff and the White House Counsel. *See* CONGRESSIONAL QUARTERLY, FEDERAL STAFF DIRECTORY vii (44th ed. 2004); NAT'L ARCHIVES & RECORDS ADMIN., OFFICE OF THE FED. REGISTER, THE UNITED STATES GOV'T MANUAL 88–89 (2003). Although the Executive Office of the President is an agency subject to the FOIA, *see* 5 U.S.C. § 552(f)(1), the Office of the President is not. *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (quoting H.R. Conf. Rep. No. 93–1380, p. 15 (1974)). In referring to the President's immediate or key advisers in the Office of the

sponse to Judicial Watch's FOIA requests, the Deputy Attorney General, to whom the Attorney General has delegated his pardon duties, invoked the deliberative process privilege. However, in moving for summary judgment, the Department also relied on the presidential communications privilege. On appeal, Judicial Watch contends that the district court erred in extending the presidential communications privilege to these internal Department documents. We agree, and accordingly we reverse, in part, the grant of summary judgment to the Department and remand the case for the district court to determine whether the Department's internal documents not "solicited and received" by the President or the Office of the President are protected from disclosure under the deliberative process privilege. We affirm the grant of summary judgment to the Department on the documents withheld under FOIA Exemption 6, and on Judicial Watch's request for a blanket waiver of FOIA processing fees.

## I.

In January and February 2001, Judicial Watch filed two FOIA requests for documents from the Justice Department. One request was to the Office of the Pardon Attorney, and the other was to the Office of the Deputy Attorney General. In each FOIA request, Judicial Watch sought release of "[a]ny and/or all [p]ardon [g]rants" by former President Clinton in January 2001, and "[a]ny and/or all pardon applications considered" by former President Clinton.[2] Judicial

President, we embrace the definitional analysis set forth in *In re Sealed Case*, 121 F.3d at 749–50, 752.

[2] Specifically, Judicial Watch requested, "all correspondence, memoranda, documents, reports, records, statements, audits, lists of names, applications, diskettes, letters, expense logs and receipts, calendar or diary logs, facsimile logs, telephone records, call sheets, tape recordings, video recordings, notes, examinations, opinions, folders, files, books, manuals, pamphlets, forms, drawings, charts, photographs, electronic mail, and other documents and things, that refer or relate to the following in any way" to pardon grants and applications considered by former President Clinton.

Watch's request for expedited processing under 28 C.F.R. § 16.5(d)(1)(iv), was denied, and the Department began releasing documents in February 2001, including some without prepayment of the FOIA processing fee. *See* 28 C.F.R. § 16.11(i)(2). Although it released thousands of pages of documents, the Department withheld 4,341 pages pursuant to FOIA Exemption 5, *see* 5 U.S.C. § 552(b)(5), and, to the extent these pages contained personal information about living individuals, pursuant to FOIA Exemption 6. *Id.* § 552(b)(6). The Department separately withheld another 524 pages under Exemption 6.

The withheld documents are described by the Department in a *Vaughn* Index[3], which organizes the records into 34 categories and specifies the particular privileges invoked for each document, with the presidential communications privilege and deliberative process privileges invoked either in full or in part. The 4,341 documents withheld under both the presidential communications and deliberative process privileges, either in full or in part, can be grouped into several broad categories. For instance, a number of withheld documents consist of letters and reports from the Deputy Attorney General to the President, advising the President on individual pardon petitions. *See Vaughn* Index 5, 19, 32. A second group of withheld documents consist of communications between the Department and the White House Counsel's Office concerning pending pardon applications, and communications between the White House Counsel and the President discussing the Department's recommendations. *See id.* 3, 16, 18, 26. A third broad category of documents are proposed recommendations for the Deputy Attorney General's consideration, which were authored by the Deputy Attorney General's staff or the Pardon Attorney. *See id.* 1, 10, 11, 13, 14, 27, 28. A fourth category consists of internal communications and working documents among and between the Deputy's Office and the Pardon Attorney, such as memoranda from the Deputy's staff to the Pardon Attorney in-

---

[3] *See Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973). The *Vaughn* index is appended to this opinion.

quiring about specific pardon applications and requesting that certain pardon recommendations be modified or resubmitted to the Deputy. *See id.* 2, 4, 7, 20, 21, 22, 25, 29, 30. A fifth category consists of communications with and documents received from other agencies and departments in the course of preparing the Deputy's pardon recommendations for the President, such as FBI memoranda on background investigations. *See id.* 17, 23, 33. Other documents are either miscellaneous lists or drafts or are difficult to categorize because they appear to be internal departmental memoranda but actually incorporate specific recommendations the Deputy had submitted for the President. *See id.* 6, 8, 9, 12, 15, 19, 24, 31. With the exception of category 34 — involving 524 documents, which the Department withheld under Exemption 6, consisting of pardon petitions and letters to or from pardon applicants and their counsel and supporters — the Department posits that all of these documents fall under the purview of the presidential communications privilege.

In March and April 2001, Judicial Watch sued the Department to enforce the FOIA requests and to challenge the denial of a blanket waiver of FOIA processing fees. The district court consolidated the cases, and the Department moved for summary judgment. The district court agreed with the Department that all 4,341 pages were properly withheld under the presidential communications privilege pursuant to Exemption 5. Rejecting Judicial Watch's position that the privilege does not apply to documents not involving White House staff, the district court concluded that because the materials had been produced for the "sole" function of advising the President on a "quintessential and nondelegable Presidential power," the extension of the presidential communications privilege to internal Justice Department documents was justified. The district court also agreed that the Department had properly withheld 524 pages of documents, consisting primarily of individual petitions for pardons, under Exemption 6. Upon reconsideration, the court also granted the Department's motion for summary judgment on the fee waiver request, finding that Judicial Watch had failed to show that

the FOIA requests were likely to contribute significantly to the public interest.

On appeal, Judicial Watch challenges the district court's rulings under Exemptions 5 and 6 and the denial of the blanket waiver of FOIA fees. Our review of the grant of summary judgment is *de novo*. *See Assassination Archives & Research Ctr. v. Cent. Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003); *Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771, 774 (D.C. Cir. 2002); *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 889 (D.C. Cir. 1995). We address Exemption 5 in Part II, Exemption 6 in Part III, and the fee waiver in Part IV.

## II.

This FOIA case calls upon the court to strike a balance between the twin values of transparency and accountability of the executive branch on the one hand, and on the other hand, protection of the confidentiality of Presidential decision-making and the President's ability to obtain candid, informed advice. In striking this balance, the court must determine the contours of the presidential communications privilege with respect to the President's pardon power under Article II, Section 2, of the Constitution in light of the organization of the executive branch with regard to pardon applications, investigations, and recommendations. One view, advocated by the Department, is that protection of the institution of the Presidency requires that the presidential communications privilege apply to all documents authored by any executive branch agency employee that are generated in the course of preparing pardon recommendations for the President. The district court adopted this functional approach, finding that the presidential communications privilege applied to the requested documents because the Pardon Attorney's "sole" responsibility was to advise the President on pardon applications. Under this approach, the Pardon Attorney is, in effect, a White House adviser, rendering the presidential communications privilege applicable to all pardon-related documents

notwithstanding the location and staff function of the Pardon Attorney in the Justice Department.

Another view, espoused by Judicial Watch, is that, in harmony with the FOIA's purpose, the principles underlying the presidential communications privilege limit its reach to documents and other communications "solicited and received" by the Office of the President, and thus do not extend to agency documents that are not submitted for Presidential consideration.  Under this view, which we endorse, internal agency documents that are not "solicited and received" by the President or his Office are instead protected against disclosure, if at all, by the deliberative process privilege.  We begin our analysis with the FOIA statute and then turn to the presidential communications privilege and the organization of the pardon process in the executive branch.

The FOIA directs that "each agency, upon any request for records . . ., shall make the records promptly available to any person" for "public inspection and copying," unless the records fall within one of the exclusive statutory exemptions. *See* 5 U.S.C. §§ 552(a)(2) & (a)(3)(A).  There is, however, a built-in presidential communications privilege for records in the possession of, or created by, immediate White House advisers, who are not considered an agency for the purposes of FOIA.  *See supra* note 1.  The FOIA amended the public disclosure section of the Administrative Procedure Act, 5 U.S.C. § 1002, which had been viewed, for a variety of reasons, as "falling short" of the disclosure goals of the statute.  *EPA v. Mink,* 410 U.S. 73, 79 (1973).  The Supreme Court has long recognized that Congress' intent in enacting FOIA was to implement "a general philosophy of full agency disclosure."  *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 754 (1989)(quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360–61 (1976)).  The Supreme Court has explained that,

> Without question, the Act is broadly conceived.  It seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a

> judicially enforceable public right to secure such informa-
> tion from possibly unwilling official hands.

*Mink,* 410 U.S. at 80. In weighing opposing interests, Con-
gress has instructed that "[s]uccess lies in providing a worka-
ble formula that encompasses, balances, and protects all
interests, yet places emphasis on the fullest responsible dis-
closure." S. Rep. No. 813, p. 3, *quoted in Mink,* 410 U.S. at
80. Accordingly, FOIA's exemptions are to be narrowly
construed. *See United States Dep't of Justice v. Tax Ana-
lysts,* 492 U.S. 136, 151 (1989); *Rose,* 425 U.S. at 361. *See
also* 5 U.S.C. § 552(d); *Bristol-Myers Co. v. FTC*, 424 F.2d
935, 938 (D.C. Cir. 1970), *cert. denied*, 400 U.S. 824 (1970).

FOIA Exemption 5 allows the government to withhold
"inter-agency or intra-agency memorandums or letters which
would not be available by law to a party . . . in litigation with
the agency." 5 U.S.C. § 552(b)(5). This language has been
interpreted as protecting against disclosure those documents
normally privileged in the civil discovery context. *See Mink*,
410 U.S. at 91. This includes documents protected under the
executive privilege doctrine. *See NLRB v. Sears, Roebuck &
Co.*, 421 U.S. 132, 149 n.16 & 150 (1975). As described in *In
re Sealed Case*, 121 F.3d at 737, the deliberative process
privilege under Exemption 5 protects "confidential intra-
agency advisory opinions" and "materials reflecting delibera-
tive or policy-making processes." *Mink,* 410 U.S. at 86, 89
(citations omitted). It rests on the policy of protecting the
"decision making processes of government agencies," *Sears
Roebuck,* 421 U.S. at 150 (citations omitted), with the "ulti-
mate purpose [being] to prevent injury to the quality of
agency decisions." *Id*. at 151. Materials that are "predeci-
sional" and "deliberative" are protected, while those that
"simply state or explain a decision the government has al-
ready made or protect material that is purely factual" are not.
*In re Sealed Case,* 121 F.3d at 737. The deliberative process
privilege, however, is qualified and can be overcome by a
sufficient showing of need. *See id.*

Exemption 5 also has been construed to incorporate the
presidential communications privilege. *See Sears Roebuck,*

421 U.S. at 149 n.16 & 150. In *United States v. Nixon,* 418 U.S. 683, 708 (1974) ("*Nixon I*"), which involved a grand jury subpoena for tape recordings of President Nixon's conversations in the Oval Office, the Supreme Court instructed that there is "a presumptive privilege for Presidential communications," which is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." Later, in *Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 449 (1977) ("*Nixon II*"), in addressing the President's challenge to a statute providing for screening by government archivists of his papers and recorded conversations, the Supreme Court emphasized *Nixon I*'s holding that "the privilege is limited to communications 'in performance of (a President's) responsibilities,' 'of his office,' and made 'in the process of shaping policies and making decisions.'" (citations omitted). As analyzed by this court in *In re Sealed Case,* 121 F.3d at 744, "[t]he President can invoke the privilege when asked to produce documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." Unlike the deliberative process privilege, which is a general privilege that applies to all executive branch officials, the presidential communications privilege is specific to the President and "applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones." *Id.* at 745. The presidential communications privilege thus is a broader privilege that provides greater protection against disclosure, although it too can be overcome by a sufficient showing of need. *See id.* at 746.

Although Judicial Watch contends that the presidential communications privilege was not properly invoked, *see In re Sealed Case*, 121 F.3d at 744–45 n.16; *Center on Corp. Responsibility, Inc. v. Shultz,* 368 F. Supp. 863, 872–73 (D.D.C. 1973); *United States v. Burr,* 25 F. Cas. 187, 192 (C.C.Va. 1807)(No. 14,694), the court need not address the issue because Judicial Watch has waived this challenge by failing to raise it in the district court. *See Singleton v. Wulff,* 428 U.S. 106, 120 (1976); *Amax Land Co. v. Quarterman,* 181 F.3d 1356, 1369 (D.C. Cir. 1999). *See also Soucie v. David,*

448 F.2d 1067, 1071 (D.C. Cir. 1971). Unlike in *In re Sealed Case*, 121 F.3d at 744–45 n.16, where the affidavit of the White House Counsel stated that he was specifically authorized by the President to invoke the presidential communications privilege, the White House Counsel's declaration here includes no such statement and there is no other indication that the President has invoked the privilege. However, the issue of whether a President must personally invoke the privilege remains an open question, *see In re Sealed Case*, 121 F.3d at 744–45 n.16, and the court need not decide it now. *Cf. United States v. Reynolds*, 345 U.S. 1, 7–8 (1953).

When the Supreme Court first acknowledged a separate privilege for presidential communications in *Nixon I*, 418 U.S. at 705, it was in the context of President Nixon's invocation of the privilege to protect his personal conversations with his chief White House advisers in the Oval Office. Although the Court in *Nixon I* and *II* outlined the nature of the privilege in terms of its "constitutional underpinnings," *see Nixon I*, 418 U.S. at 705–06, twenty years passed before, in *In re Sealed Case,* a court attempted to define the scope of the privilege more precisely. In *In re Sealed Case,* 121 F.3d at 746–47, the court was called upon to extend the privilege beyond communications directly involving and documents actually viewed by the President, to the communications and documents of the President's immediate White House advisers and their staffs. In the instant case, the Department seeks a further extension of the presidential communications privilege to officials within the Justice Department whose sole function, according to the Department, is to advise and assist the President in the performance of his non-delegable pardoning duty. We decline to sanction such an extension of the presidential communications privilege to all agency documents prepared in the course of developing the Deputy Attorney General's pardon recommendations for the President. Instead, consistent with the teachings of *Nixon I* and *II* and *In re Sealed Case*, we hold that the presidential communications privilege applies only to those pardon documents "solicited and received" by the President or his immediate White House advisers who have "broad and significant responsibility for investigating

and formulating the advice to be given the President." *Id.* at 752.

This limitation, conveniently summarized by *In re Sealed Case*'s phrase "solicited and received," is necessitated by the principles underlying the presidential communications privilege, and a recognition of the dangers of expanding it too far. At core, the presidential communications privilege is rooted in the President's "need for confidentiality in the communications of his office," *Nixon I*, 418 U.S. at 712–13, in order to effectively and faithfully carry out his Article II duties and "to protect 'the effectiveness of the executive decision-making process.'" *In re Sealed Case*, 121 F.3d at 742 (quoting *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973)). The privilege extends to the President's immediate advisers because of the need to protect "candid, objective, and even blunt or harsh opinions," for, as the Supreme Court has recognized, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon I*, 418 U.S. at 708. However, in *In re Sealed Case*, the court recognized that, in determining whether "restricting the presidential communications privilege to communications that directly involve the President will 'impede the President's ability to perform his constitutional duty,'" 121 F.3d at 751 (quoting *Morrison v. Olson*, 487 U.S. 654, 691 (1988)), there is, in effect, a hierarchy of presidential advisers such that the demands of the privilege become more attenuated the further away the advisers are from the President operationally. *See id.* at 752. Thus, as we demonstrate below, because pardon documents obtained from other agencies by Justice Department staff undergo various stages of intermediate review before pardon recommendations are submitted for consideration by the President and his immediate White House advisers, with some documents never making their way to the Office of the President, the same confidentiality and candor concerns calling for application of the presidential communications privilege in *Nixon I and II* and *In re Sealed Case* do not apply as forcefully here.

Although *In re Sealed Case* was not a FOIA case, it too involved a non-delegable duty of the President under Article II, Section 2 of the Constitution: the appointment and removal power for heads of Executive Departments and members of his Cabinet. The White House Counsel had conducted an investigation of alleged conflicts of interest of the Secretary of Agriculture and, on the basis of that investigation, had released a report to the public. A grand jury issued a subpoena *duces tecum* seeking all documents on the former Secretary possessed by the White House and any other documents "relating in any way to" the White House Counsel's report. *Id.* at 734–35. When the White House withheld many of the documents under the deliberative process and presidential communications privileges, the Office of Independent Counsel moved to compel production. The district court, upon conducting *in camera* review of the documents, ruled that the White House had properly invoked the presidential communications and deliberative process privileges. *Id.* at 735–36. On appeal, this court held that although all the documents sought were protected by the presidential communications privilege, the Independent Counsel had demonstrated a sufficient showing of need to obtain some of the information in the documents, and remanded the case to the district court to determine what information should be released. *Id.* at 757.

Consistent with the principles underlying the presidential communications privilege, the court in *In re Sealed Case* espoused a "limited extension" of the privilege "down the chain of command" beyond the President to his immediate White House advisers only, holding that "communications made by [such] presidential advisers in the course of preparing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President." *Id.* at 749–50, 752. Emphasizing "the need for confidentiality to ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge," *id.* at 750, the court also held that "the privilege must apply both to communications which these advisers *solicited and received* from others

as well as those they authored themselves." *Id.* at 752 (emphasis added). However, the court emphasized the limited nature of its holding, cautioning against the dangers of "expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President." *Id.* The court instructed that "[n]ot every person who plays a role in the development of presidential advice, no matter how remote and removed from the President, can qualify for the privilege. In particular, the privilege should not extend to staff outside the White House in executive branch agencies." *Id.*

While the Department attempts to discount the court's instruction as mere dictum, it is unavoidably relevant for the purposes of defining the contours of the presidential communications privilege. In undertaking the task of conducting a more comprehensive analysis of the presidential communications privilege than had been done by the Supreme Court in *Nixon I* and *II* or any other court since then, the *In re Sealed Case* court's statement limiting the scope of the privilege to key White House advisers in the Office of the President and their staff cannot easily be divorced from the issues and concerns underlying its holding. Those issues and concerns are equally applicable here. The court in *In re Sealed Case* recognized the need to ensure that the President would receive full and frank advice with regard to his non-delegable appointment and removal power, but was also wary of undermining countervailing considerations such as openness in government. *See id.* at 749. Hence, the court determined that while "communications authored or solicited and received" by immediate White House advisers in the Office of the President and their staff could qualify under the privilege, communications of staff outside the White House in executive branch agencies that were not solicited and received by such White House advisers could not. *See id.* at 752. The court explained that only communications at the level of the immediate White House adviser's staff "are close enough to the President to be revelatory of his deliberations or to pose a risk to the candor of his advisers." *Id.* There is no indication in *Nixon I* or *II* or other Supreme Court jurisprudence

that the boundaries set by *In re Sealed Case* were inappropriate. Rather, until *In re Sealed Case*, the privilege had been tied specifically to direct communications of the President with his immediate White House advisers. *See Nixon I*, 418 U.S. at 708; *Nixon II*, 433 U.S. at 448–49. The reluctance of the *In re Sealed Case* court to extend the presidential communications privilege beyond the limits of its requirements applies no less here.

Consequently, we proceed on the basis that "the presidential communications privilege should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *In re Sealed Case*, 121 F.3d at 752. Further extension of the privilege to internal Justice Department documents that never make their way to the Office of the President on the basis that the documents were created for the sole purpose of advising the President on a non-delegable duty is unprecedented and unwarranted. The only documents at issue in *In re Sealed Case* were documents created within the White House or received by key White House advisers or their staff. The majority of the withheld documents were authored by two associate White House Counsel, the White House Counsel and Deputy Counsel, and the President's Chief of Staff or Press Secretary. *See id.* at 757. Because these advisers were immediate White House staff in the Office of the President with significant responsibility for advising the President, the court held that these documents were protected by the privilege. *See id.* at 758. The few documents authored by a legal extern in the White House Counsel's Office and the few that had no author were also held by the court to be protected by the privilege because they "were clearly created at the request of the two associate White House Counsel with broad and significant responsibility" for the White House Counsel's investigation of the Secretary of Agriculture, and because the documents were received by these advisers. *Id.*

The Department now would have the court extend the presidential communications privilege to communications of persons in the Justice Department who are at least twice removed from the President, among and between the Offices

of the Pardon Attorney and the Deputy Attorney General, as well as other agencies, that were never received by immediate White House advisers in the Office of the President. Undoubtedly a bright-line rule mandating application of the privilege to all departmental or agency communications related to the preparation of the Deputy Attorney General's pardon recommendations for the President would be easier to apply than a rule under which pardon communications not "solicited and received" by the Office of the President must be individually examined under the deliberative process privilege. But such a bright-line rule is inconsistent with the nature and principles of the presidential communications privilege, as well as the goal of best serving the public interest. *See In re Sealed Case*, 121 F.3d at 751–52. Communications never received by the President or his Office are unlikely to "be revelatory of his deliberations." *Id.* at 752. Nor is there reason to fear that the Deputy Attorney General's candor or the quality of the Deputy's pardon recommendations would be sacrificed if the presidential communications privilege did not apply to internal agency documents. *See id.* Any pardon documents, reports, or recommendations that the Deputy Attorney General submits to the Office of the President, and any direct communications the Deputy or the Pardon Attorney may have with the White House Counsel or other immediate presidential advisers will remain protected. The *In re Sealed Case* court's concern for providing "sufficient elbow room for [presidential] advisers to obtain information from all knowledgeable sources," *id.*, will also not be undermined. It is only those documents and recommendations of Department staff that are not submitted by the Deputy Attorney General for the President and are not otherwise received by the Office of the President, that do not fall under the presidential communications privilege. Although the potential for chilling the candor of the staffs of the Pardon Attorney or the Deputy Attorney General is greater than if everything produced in relation to pardon recommendations were covered under the privilege, because the deliberations of these staff are not close enough to the President to be revelatory of his deliberations and will in any event remain protected pursuant to the

deliberative process privilege, the justification for expanding the presidential privilege that far disappears. *See id.*

Moreover, the President's discretion and autonomy in granting pardons, *see United States v. Klein*, 80 U.S. (13 Wall.) 128, 147 (1871), which may be based on the Deputy Attorney General's recommendations, the advice of his key White House advisers, or such other sources as he may seek out, counsel against further expansion of the privilege. It would be implausible, however, to conclude that documents that neither the President nor his key advisers receive from the Deputy Attorney General are part of the President's personal decision-making process such that their exclusion from the scope of the privilege would impair the quality of his deliberations. For instance, the court can hardly conclude that examining documents such as an "[e]-mail within the Department of Justice, among officials in [the Office of the Deputy Attorney General] and [the Office of the Pardon Attorney] transmitting information on particular pardons, and requesting information, such as warrants and background investigations," *see Vaughn* Index category No. 7, under the deliberative process privilege rather than the presidential communications privilege, would jeopardize the President's confidentiality and decision-making process. Extending the presidential communications privilege to cover such internal Department documents would be both contrary to executive privilege precedent and considerably undermine the purposes of FOIA to foster openness and accountability in government. Indeed, a bright-line rule expanding the privilege could have the effect of inviting use of the presidential privilege to shield communications on which the President has no intention of relying in exercising his pardon duties, for the sole purpose of raising the burden for those who seek their disclosure. Such an approach would distort the rationale adopted by the Supreme Court in *Nixon I* and *II* and the principled analysis of this court in *In re Sealed Case*.

However, the Department contends that the Pardon Attorney is, in effect, a "member[ ] of an immediate White House adviser's staff who ha[s] broad and significant responsibility for investigating and formulating the advice to be given the

President." *In re Sealed Case,* 121 F.3d at 752. Under this view, because the Pardon Attorney's sole purpose is to advise the Deputy Attorney General, and ultimately, the President on pardon applications, and the Pardon Attorney either authored or compiled the documents sought, the documents are protected by the presidential communications privilege. But the Department's view ignores the separate responsibilities of the Deputy Attorney General and the Pardon Attorney as well as the Pardon Attorney's history of invoking the deliberative process privilege to protect the confidentiality of the Department's internal pardon process.

The court has long recognized that the organization of governmental functions is of significance for the purposes of FOIA. In *Ryan v. Dep't of Justice,* 617 F.2d 781, 789 (D.C. Cir. 1980), the court observed that,

> In many different areas the President has a choice between using his staff to perform a function and using an agency to perform it. While not always substantively significant, these choices are often unavoidably significant for FOIA purposes, because the Act defines agencies as subject to disclosure and presidential staff as exempt.

The court considered the President's decisions about the location of advisers as reflective of his understanding of the access that the public could potentially have to government documents under FOIA. *See id.* at 789. Although the issue in *Ryan* involved the meaning of "agency records" under FOIA, namely, whether questionnaire responses of United States Senators sent to the Attorney General regarding their procedures for selecting and recommending potential judicial nominees were "agency records," the court's analysis is nonetheless instructive. Just as the power to grant pardons is a quintessential and non-delegable Presidential duty, so too is the Article II, Section 2 power to select and appoint federal judges. There, as here, the President had delegated to the Attorney General the responsibility of evaluating potential nominees, receiving recommendations, and recommending candidates to the President. In performing this duty, the

Attorney General solicited questionnaire responses from Senators on their procedures for recommending potential nominees, *id.* at 784, much as the Deputy Attorney General, through the Pardon Attorney, solicits responses from agencies on pardon applicants. While an inquiry into whether documents are "agency records" under FOIA is different from an inquiry into whether documents come within a FOIA exemption, each inquiry ultimately involves shielding government documents from public scrutiny — in these cases, on the basis that the documents were produced for the purpose of advising the President on a nondelegable Presidential duty.

The court in *Ryan* rejected a functional approach. It reasoned that although the documents were received for the purpose of advising the President on a nominating role that was exclusively his, *id.* at 786, adopting a functional approach to "defin[e] 'agency records' by the purpose for which they exist, would cut back severely on the FOIA's reach as interpreted by courts since its inception." *Id.* at 788. The court observed that judicial nominations were "by no means unique as an instance where normal agency functions involve some element of giving advice to the President." *Id.* at 787. For instance, the Office of Legal Counsel in the Justice Department exists to assist the Attorney General in advising the President on major legal issues, a large portion of the Secretary of State's functions is to advise the President in the conduct of foreign affairs, *id.* at 787–88, and the Central Intelligence Agency and the National Security Agency produce documents for the function of advising the President in his "solely presidential role of Commander-in-Chief." *Id.* at 788. That reasoning is equally applicable here. Extension of the presidential communications privilege beyond the limits of *In re Sealed Case* to all documents prepared or received by the Pardon Attorney or his Office simply because they are produced for the sole function of assisting the Deputy Attorney General in presenting pardon recommendations for the President would have far-reaching implications for the entire executive branch that would seriously impede the operation and scope of FOIA.

However, rather than focusing on whether the internal Department documents are "agency records," as in *Ryan,* we proceed on the basis that the Office of the Pardon Attorney, as an office within the Justice Department, is an agency subject to FOIA. *See Crooker v. Office of Pardon Attorney,* 614 F.2d 825, 827 (2d Cir. 1980). It is the respective roles of the Deputy Attorney General and the Pardon Attorney in making pardon recommendations for the President that are significant for our analysis. The Department's assertion that the Pardon Attorney and his staff can be likened to "immediate White House adviser's staff," *In re Sealed Case,* 121 F.3d at 752, or as an extended arm of the White House Counsel's Office, such that all documents authored or solicited and received by the Pardon Attorney fall under the protection of the presidential communications privilege, is untenable in light of the review and intermediate decision-making by the Deputy Attorney General. The declarations and attachments filed by the Department in the district court reveal that the Attorney General has delegated his advisory duties on pardons to the Deputy Attorney General, and within the Department, the Pardon Attorney assists the Deputy Attorney General in performing this duty, as well as "such other duties as may be assigned," *see* 28 C.F.R. § 0.35(b), by the Attorney General or the Deputy Attorney General.[4] Thus, the Pardon Attorney receives, on behalf of the President, applications for pardons for federal criminal offenses, and in accordance with instructions from the Deputy Attorney General's Office, conducts an investigation, calling upon other agencies such as the Internal Revenue Service, the Federal Bureau of Investigation, the U.S. Probation Office and U.S. Attorney in the District where the applicant was convicted. *See* 28 C.F.R. § 1.6(a). Staff in the Office of the Deputy review the Pardon Attorney's proposed recommendations and investigatory report, and upon any necessary further investigation, prepare a report for the Deputy Attorney General. Ultimately, the

---

[4] Although the current rules refer to the "Associate Attorney General," *see* 28 C.F.R. §§ 0.35(b), 0.36 (2003), the declarations, which were filed in 2002, refer to the delegation of the Attorney General's pardon duties to the Deputy Attorney General.

Deputy Attorney General submits, on behalf of the Attorney General, his recommendations for the President on the pardon applications that the Deputy has determined should be considered by the President. *See id.* § 1.6(c).

The Pardon Attorney, therefore, does not, as a matter of his working relationships, directly advise the President on pardon recommendations or serve as immediate staff to the White House Counsel or other key White House advisers in the Office of the President. In practice, the Deputy Attorney General acts as an intermediate controlling official who exercises independent judgment on which pardon applications and what recommendations to submit for the President's consideration. *Cf. Ryan*, 617 F.2d at 786. These internal working relationships are part of the "*regular* business" of the Department. *See id.* at 787. The fact that the Deputy Attorney General's recommendations for the President are transmitted to the Office of the White House Counsel through the Pardon Attorney does not minimize the significance for FOIA purposes of the Department's intermediary role in preparing pardon recommendations for the President. This role contrasts with that of the key White House advisers in the Office of the President who directly advise the President as was discussed in *In re Sealed Case*, 121 F.3d at 752. The White House Counsel, in the Office of the President, who enjoys close proximity to the President, is one such key adviser; the Pardon Attorney, in the Justice Department, who is at least twice removed from the President, is not.

Nor can the Deputy Attorney General or Attorney General be equated with the close presidential advisers discussed in *In re Sealed Case.* Since the creation of the Department in 1870, the Attorney General has not only served as an adviser to the President, but also as the administrator of the Department. *See Ryan*, 617 F.2d at 787. Recognizing the problem of "dual-hat" advisers who perform other functions in addition to advising the President, *see Armstrong v. Executive Office of the President*, 90 F.3d 553, 558 (D.C. Cir. 1996), the court in *Ryan* noted that the Attorney General, as head of the Justice Department, could not be treated as a non-agency exempt from the FOIA when he was engaged in his presiden-

tial advisory functions. *Ryan*, 617 F.2d at 788. In *In re Sealed Case*, the court's reference to " 'dual hat' presidential advisers," was limited to those "immediate White House adviser's staff" who "exercise substantial independent authority or perform other functions in addition to advising the President," 121 F.3d at 752, and for these individuals, the presidential communications privilege could apply if the government bore its burden of proving that their communications occurred in the course of advising the President. *See id.* But, the court in *Ryan* rejected the notion that the Attorney General should be treated as "the President's immediate personal staff," or as a unit within the Executive Office of the President "whose sole function is to advise the President." *Id.* at 788. *Cf. Soucie*, 448 F.2d at 1075. Extension of the presidential communications privilege to the Attorney General's delegatee, the Deputy Attorney General, and his staff, on down to the Pardon Attorney and his staff, with the attendant implication for expansion to other Cabinet officers and their staffs, would, as the court pointed out in *In re Sealed Case*, "pose a significant risk of expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President." *Id.*

Instead, consistent with the Department's historical position and the underlying public interest, its internal documents that are not "solicited and received" by the President or the Office of the President should be evaluated under the deliberative process privilege. Heretofore, in complying with FOIA requests, the Pardon Attorney has withheld documents that he or she considered privileged under the deliberative process privilege, not the presidential communications privilege. For instance, in *Binion v. United States Dep't of Justice*, 695 F.2d 1189, 1191 (9th Cir. 1983), when an applicant for a Presidential pardon sought disclosure under FOIA of all records dealing with his prior pardon applications, the Pardon Attorney relied only on Exemption 5's deliberative process privilege, Exemption 7's privilege for law enforcement records, and the Privacy Act's "general exemption" for rap sheets and other criminal reports, to justify withholding the documents. *See also Crooker*, 614 F.2d at 828. Indeed, the declaration of

Deputy Attorney General Larry D. Thompson states that "the documents withheld in this litigation … are properly subject to the deliberative process privilege," evidencing an expectation that working documents, produced in the course of developing the Deputy Attorney General's recommendations for the President, would be evaluated only under the deliberative process privilege, not the presidential communications privilege. The ultimate goal of protecting the confidentiality of the President's decision-making and his access to candid advice is achieved under the deliberative process privilege for those working documents that never make their way to the Office of the President. Inasmuch as disclosure of factual information may reveal the nature and substance of the issues before the President, factual information is protected against disclosure under the deliberative process privilege "if it is inextricably intertwined with policy-making processes." *Soucie,* 448 F.2d at 1077–78.

Consequently, to define the scope of the presidential communications privilege functionally by focusing on the "sole" responsibility of the Pardon Attorney to advise the President on his pardon duty, ignores the internal working relationships of the Pardon Attorney within the Justice Department and the fact that it is the Deputy Attorney General who makes the final decision on the pardon recommendations to be submitted for the President's consideration. While a functional approach has the virtue of simplicity, it comes at too high a price: Any document that in any way pertains to pardons would be covered by the presidential communications privilege regardless of whether it is submitted with the Deputy Attorney General's pardon recommendations for the President. To hold that all work performed in connection with a standing request by the President for the Attorney General's pardon recommendations falls under the presidential communications privilege entails fundamental conceptual difficulties. First, such an interpretation would sweep within the reach of the presidential privilege much of the functions of the executive branch, namely, to advise the President in the performance of his Article II duties. Courts have long been hesitant to extend the presidential communications priv-

ilege so far, for ours is a democratic form of government where the public's right to know how its government is conducting its business has long been an enduring and cherished value. *See In re Sealed Case,* 121 F.3d at 749 (quoting Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 WRITINGS OF JAMES MADISON 103 (Gaillard Hunt, ed. 1910)). *See also Mink*, 410 U.S. at 105 (Douglas, J., dissenting) (quoting Henry Steels Commager, *The New York Review of Books*, Oct. 5, 1972, p. 7). As we cautioned in *In re Sealed Case,* the courts must be "ever mindful of the dangers [of] cloaking governmental operations in secrecy." 121 F.3d at 762. Second, extending the presidential communications privilege to working documents produced in the course of advising the President on his pardon power would be inconsistent with the Department's historical approach of invoking the deliberative process privilege rather than the presidential communications privilege to protect its internal documents and deliberations from public disclosure. The Department has not argued, much less proffered any evidence, that the President's decision-making process on pardons has been compromised in any manner as a result of the Department's prior reliance on the deliberative process privilege.

Our dissenting colleague reaches a different conclusion, namely, that any and all documents originated for the sole purpose of advising the President on a "quintessential and nondelegable" power must be protected by the presidential communications privilege, irrespective of whether they are received by the President or any of his close White House advisers. Dissenting Op. at 1. The dissent points to the *In re Sealed Case* court's statement that the privilege protects "pre-decisional" documents produced in the course of advising the President, not just those documents that physically enter the Oval Office. 121 F.3d at 750. *See* Dissenting Op. at 2. However, application of this statement to the pardon documents at issue is problematic for several reasons. The *In re Sealed Case* court extended the presidential communications privilege beyond communications actually seen by the President to the working papers of the President's immediate White House advisers in the Office of the President, not

simply because the documents were "originated for the sole purpose of advising the President," Dissenting Op. at 1, but because there was reason to believe, given the decisionmaking process at issue, that the President's confidentiality and access to candid advice might otherwise suffer. That concern is far more attenuated for working documents of an agency that were never submitted to the Office of the President. The dissent's point seems to be that with regard to nondelegable presidential duties, no matter how many steps a communication is removed from the President, if it is protected only by the deliberative process privilege and not by the presidential communications privilege, it risks exposing the "issues before the President," thus compromising his interest in confidentiality. Dissenting Op. at 7. But this approach fails to acknowledge both "the general rule, underscored by the Supreme Court in *Nixon [I]*, that privileges should be narrowly construed," *In re Sealed Case*, 121 F.3d at 749, and the significance of the hierarchy of presidential advisers underlying the analysis in *In re Sealed Case*, 121 F.3d at 752. Whereas the *In re Sealed Case* court recognized that the need for the presidential communications privilege becomes more attenuated the further away the advisers are from the President, the dissent fails to acknowledge that the "organizational chart" affects the extent to which the contents of the President's communications can be inferred from predecisional communications.

The reality is that working papers of an immediate White House adviser in the Office of the President will be far more revelatory of advice given to the President than internal Department documents such as emails within the Department "transmitting information on particular pardons, and requesting information, such as warrants and background investigations." *See Vaughn* Index category No. 7. The less one can learn from these twice- and thrice-removed communications about "the evolution of advisers' positions and as to the different policy options considered along the way," Dissenting Op. at 2, the less need is there to protect them under the presidential communications privilege. Although the court acknowledged in *In re Sealed Case* that the deliberative

process privilege would be inadequate to protect the President's confidentiality and the candor of his immediate White House advisers, 121 F.3d at 750, the court nevertheless concluded that the presidential communications privilege should not extend outside of the White House into executive branch agencies. *See id.* at 752. For, to the extent those concerns remain with regard to internal agency communications, the deliberative process privilege protects confidential intra- and inter-agency communications consisting of recommendations or opinions that are advisory or deliberative in nature as well as communications revelatory of the President's decisionmaking process. *See Soucie*, 48 F.2d at 1077–78. *See also Mink*, 410 U.S. at 86, 89. The dissent's further argument that the President could have organized the pardon process to bring more pre-decisional communications within the scope of the presidential communications privilege, *see* Dissenting Op. at 5; *cf. Ass'n. of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.3d 898, 910 (D.C. Cir. 1993), is irrelevant. The President has not done so, and the organizational structure of presidential decisionmaking matters in determining the scope of the presidential communications privilege because it speaks to the strength of the President's confidentiality interests in a particular communication. In the FOIA context, moreover, the court has long recognized that the way in which the President organizes and delegates his official duties is significant. *See Ryan*, 617 F.2d at 789. Finally, the dissent's qualification that the protection of the presidential communications privilege would attach only if the advice is on a "quintessential and nondelegable Presidential power," Dissenting Op. at 1, draws an arbitrary line, for it provides no reason to conclude that presidential decisions that could have been delegated, but were not, are entitled to less candid or confidential advice than those that could not have been delegated at all.

Accordingly, we hold that the presidential communications privilege applies to pardon documents "solicited and received" by the President or his immediate advisers in the Office of the President, and that the deliberative process privilege applies to internal agency documents that never make their

way to the Office of the President. This approach heeds the teachings of *Nixon I* and *II* and *In re Sealed Case*, and strikes an appropriate balance between the President's need for confidentiality and frank advice and the obligations of open government. As is demonstrated by the Department's historical reliance on the deliberative process privilege, the public interest in protecting the President's decision-making process is preserved without extending the presidential communications privilege to internal Department documents that do not accompany the Deputy Attorney General's pardon recommendations for the President and are not otherwise solicited and received by the Office of the President. Although the Supreme Court has pointed out that the "expectation of the confidentiality of executive communications [ ] has always been limited and subject to erosion over time after an administration leaves office," *Nixon II*, 433 U.S. at 451, the Department does not suggest that a lesser interest in confidentiality is called for because the requested documents are those of a former Administration.

As noted, the *Vaughn* index indicates that certain documents requested by Judicial Watch are not covered by the presidential communications privilege. Internal documents between the Office of the Pardon Attorney and the Deputy Attorney General's staff or communications within the Deputy Attorney General's office, that were not sent to the Office of the President, appear to be more appropriately examined under the deliberative process privilege. *See, e.g., Vaughn* Index category Nos. 1, 2, 4, 10, 11, 13, 14, 19, 20, 21, 22, 25, 27–30. We therefore reverse that part of the grant of summary judgment extending the presidential communications privilege to the Department's internal documents. With regard to other categories of documents, however, it is difficult to determine whether or not all or some of the documents were forwarded to the Office of the President. *See, e.g., Vaughn* index Category 12 (letters among the Office of the Pardon Attorney, United States Attorney's Offices, and the White House). On remand, the district court should review those documents and determine whether they fall within the presidential communications privilege. For those documents

not protected by the presidential communications privilege, the district court should determine whether they were properly withheld under FOIA Exemption 5's deliberative process privilege or under FOIA Exemption 6, giving due consideration to Judicial Watch's claim that the balance of interests weighs in favor of releasing the records and to the agency's obligation, pursuant to 5 U.S.C. § 552(b), to disclose all reasonably segregable, nonexempt portions of the documents.

### III.

FOIA Exemption 6 allows the government to withhold documents about individuals in "personnel and medical and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Its primary purpose is to "protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *United States Dep't of State v. Washington Post Co.,* 456 U.S. 595, 599 (1982). The reference to "similar files" has been interpreted broadly to include those "detailed Government records on an individual which can be identified as applying to that individual." *Id.* at 602 (quoting H.R. Rep. No. 1497, U.S. Code Cong. & Admin. News 1966, p. 2428). The Supreme Court has long rejected a "cramped notion of personal privacy." *United States Dep't of Justice v. Reporters Comm. For Freedom of the Press,* 489 U.S. 749, 763 (1989).

The district court ruled that the release of non-public, personal information regarding the pardon applicants, their families, and the crimes they committed, could reasonably be interpreted as invasions of personal privacy, and that there was no indication that the disclosure of such information would contribute significantly to the public's understanding of the government's activities. *See Judicial Watch, Inc. v. United States Dep't of Justice,* 259 F. Supp. 2d 86, 91–92 (D.D.C. 2003). On appeal, Judicial Watch contends that Exemption 6 is inapplicable, first, because pardon applications do not concern personal information about prisoners but rather, the basis upon which their clemency was granted, and

second, because convicted felons are not entitled to the same privacy rights as other citizens. These contentions are without merit.

In *Reporters Comm.,* the Supreme Court held that the disclosure of contents of FBI rap sheets constituted an unwarranted invasion of personal privacy, and thus were exempt from disclosure. Although the case involved FOIA Exemption 7(c) rather than Exemption 6, the Court's reasoning is instructive. This court has deemed the privacy inquiry of Exemptions 6 and 7(c) to be essentially the same, *see Reed v. NLRB,* 927 F.2d 1249, 1251 (D.C. Cir. 1991); *Nat'l Ass'n of Retired Fed. Employees v. Horner,* 879 F.2d 873, 874 D.C. Cir. 1989), although the Supreme Court has recently construed Exemption 7(c) to be broader. *See Nat'l Archives & Records Admin. v. Favish,* 124 S. Ct. 1570, at 1577 (2004). In *Reporters Comm.,* the Supreme Court described privacy as an "individual interest in avoiding disclosure of personal matters . . . . [encompassing] the individual's control of information concerning his or her person." 489 U.S. at 762–63. The Court stated that although much of the content of FBI rap sheets were a matter of public record, *id.* at 753, the limited availability of an actual rap sheet to the public reflected a recognition of the privacy interests of criminals, for there was a distinction, in the court's view, of "scattered disclosure of the bits of information contained in a rap sheet and revelation of the rap sheet as a whole." *Id.* at 764. Thus, the Court not only recognized that criminals have privacy interests, but also that the availability of the public information contained in rap sheets, when compiled as one document, implicated privacy interests.

The documents withheld by the Department under Exemption 6 consist primarily of individual petitions for pardons, including non-public personal information about the applicants and their lives before and after their convictions and personal information about third parties. The pardon application calls for a broad range of detailed and highly personal information about a pardon applicant. In addition to the usual identifying information such as name, home address, social security number, citizenship, and physical characteris-

tics, the form asks the applicant to provide a detailed account of his or her criminal history, substance abuse, occupational licensing history, and such personal biographical matters as family history, marital status, and the names, birth dates, custody, and location of the applicant's children. Information must also be provided on residences, employment history, military record, financial status, and medical history. Applicants generally also include a description of their lives since conviction, their mental and physical well-being, and emotional pleas for pardons, including letters from friends, family members, employers, and attorneys.

These documents easily fall under the purview of an individual's "interest in avoiding disclosure of personal matters," and controlling "information concerning his or her person." *Reporters Comm.*, 489 U.S. at 762–63. The disclosure of the documents Judicial Watch requests would implicate far more serious privacy interests than those at stake in *Reporters Comm.* Even though some of this information has previously been disclosed to the public, under the reasoning of *Reporters Comm.*, the information is nevertheless entitled to protection. *See id.* at 764. Judicial Watch's reliance on such cases as *United States v. Amen,* 831 F.2d 373 (2nd Cir. 1987), for the proposition that pardon applicants do not have the same privacy interests as law-abiding citizens, is misplaced. *Amen* involved a Fourth Amendment claim where the Second Circuit held that prison inmates have no reasonable expectation of privacy — i.e., they are subject to strip searches, random cell searches, and monitoring of their telephone conversations. 831 F.2d at 379–80 (citations omitted). It does not follow that pardon applicants, who are not necessarily still in custody, do not have a privacy interest in documents containing sensitive personal information. *See also Smith v. Fairman*, 678 F.2d 52, 54 (7th Cir. 1982). Furthermore, these types of personal records are unlikely to shed light on the Department's conduct in the pardoning process. *See Reporters' Comm.*, 489 U.S. at 773. The operative inquiry in determining whether disclosure of a document implicating privacy issues is warranted is the nature of the requested document itself, not the purpose for which the document is

being requested. *See id.* at 772. Accordingly, we affirm the grant of summary judgment for documents withheld pursuant to Exemption 6, for the district court correctly ruled that their disclosure would constitute "a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), that outweighs any public interest that Judicial Watch may claim in their disclosure.

## IV.

Under FOIA, the Department is permitted to charge a reasonable fee for searching, copying, and reviewing its files. *See* 5 U.S.C. § 552(a)(4)(A)(ii). Fees are to be reduced or waived if disclosure of the requested information is "in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester." *Id.* § 552(a)(4)(A)(iii). For a request to be in the "public interest," four criteria must be satisfied: (1) the request must concern the operations or activities of government; (2) the disclosure must be "likely to contribute" to an understanding of government operations or activities; (3) disclosure must contribute to an understanding of the subject by the public at large; and (4) disclosure must be likely to contribute significantly to such public understanding. *See* 28 C.F.R. § 16.11(k)(2). The Department's regulations also provide that, "The disclosure of information that already is in the public domain, in either a duplicative or a substantially identical form, would not be as likely to contribute to such [public] understanding where nothing new would be added to the public's understanding." *Id.* § 16.11(k)(2)(ii). The burden of satisfying the public interest standard is on the requestor. *See Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988). However, proof of the ability to disseminate the released information to a broad cross-section of the public is not required. *See Carney v. United States Dep't of Justice*, 19 F.3d 807, 814 (2d Cir. 1994).

In response to Judicial Watch's requests for a blanket waiver of FOIA processing fees under 5 U.S.C.

§ 552(a)(4)(A)(iii), the Department, in moving for summary judgment, argued that Judicial Watch was seeking information that was already in the public domain and thus not likely to contribute significantly to the public's understanding of the pardon process. After initially denying the Department's motion on the ground that Judicial Watch did not have access to any of the documents and could not determine whether they were publicly available, the court, upon reconsideration, granted summary judgment to the Department based upon its subsequent release of more than 15 percent of the total pages of the non-exempt documents and a supplemental Department affidavit averring that additional non-exempt pardon documents were also in the public domain. On appeal, Judicial Watch contends that it has met all four of the Department's criteria for qualifying for a fee waiver, *see* 28 C.F.R. § 16.11(k)(2)(i-iv), but has been placed in a "catch–22" situation by being asked to identify the documents that would most likely contribute to the public's understanding of the pardon process before it has access to any of the documents.

Despite receipt of thousands of pages of requested documents, Judicial Watch has made no showing that these documents were not publicly available. Absent some indication of why it was not reasonable for the district court to have relied on the documents already released by the Department and its supplemental declaration as to the remaining non-exempt documents, there is no basis to conclude that Judicial Watch is entitled to a blanket waiver of FOIA processing fees. *See Larson*, 843 F.2d at 1483. Under Department regulations, when the costs of an anticipated duplication is determined to be in excess of $250, the Department may "require the requester to make an advance payment of an amount up to the amount of the entire anticipated fee" prior to producing any of the documents to the requester. *See* 28 C.F.R. § 16.11(i)(2). Further, if advance payment or a good faith commitment to pay the anticipated duplication fees is not provided, the regulations provide that "the request shall not be considered received and further work will not be done on it until the required payment is received." *Id.* § 16.11(i)(4).

Hence, the Department properly refused to process further documents without payment of the required fees.

At the same time, Judicial Watch cannot be expected to show that the unreleased documents are not, in fact, publicly available. The Department acknowledges as much on appeal. While continuing to maintain that Judicial Watch is not entitled to a blanket fee waiver, the Department states in its brief that some documents sought by Judicial Watch may qualify for a waiver of fees, and that the Pardon Attorney will grant fee waivers for those particular documents. *See* Appellee's Brief at 43. In light of this acknowledgment, Judicial Watch has obtained the only relief to which it is entitled under the regulations. *See* 5 U.S.C. § 552(a)(4)(A)(iii); 28 C.F.R § 16.11(k)(2)(i-iv).

Accordingly, we reverse, in part, the grant of summary judgment to the Department based on application of the presidential communications privilege to the internal documents of the Department withheld pursuant to Exemption 5, and otherwise affirm the grant of summary judgment to the Department on documents withheld pursuant to Exemption 6 and Judicial Watch's request for a blanket waiver of the FOIA processing fees.

# APPENDIX

Judicial Watch, Inc. v. U.S. Department of Justice
CV 01-0639
U.S. District Court
District of Colombia

Vaughn Index

Description of the Office of the Deputy Attorney General pardon records protected by FOIA Exemptions 5 and 6. The 4825 pages withheld in full and 40 pages withheld in part are grouped into thirty-four categories and described below.

| Number | Category | Exemptions | Pages |
|---|---|---|---|
| 1 | Correspondence control sheets forwarding proposed recommendations on pardon applications from the Office of the Pardon Attorney (OPA) and from Ms. Deborah Smolover, Counsel to the Deputy Attorney General (DAG), to the Deputy Attorney General. | Presidential Communications Privilege. Deliberative in Part Privacy | 13 |
| 2 | Two memoranda from the Pardon Attorney when he worked for the Office of the Deputy Attorney General (ODAG), to Marshall Jarrett, an official in the ODAG, providing his proposed recommendations on certain pardon applications. | Presidential Communications Privilege Deliberative in part Privacy | 4 |
| 3 | Typed notes and memoranda from the Pardon Attorney to Ms. Meredith Cabe of the White House Counsel's Office (WHCO) providing responses to inquiries from Ms. Cabe regarding particular pardon applicants. | Presidential Communications Privilege Deliberative in part Privacy | 32 |

| 4 | Electronic mail (e-mail) and memoranda from Ms. Smolover to the Pardon Attorney asking questions about pardon applicants and requesting that certain draft pardon recommendations be modified and submitted again to the DAG. | Presidential Communications Privilege<br>Deliberative in part<br>Privacy | 8 |
|---|---|---|---|
| 5 | Signed letters of advice from the DAG, Acting DAG, or the Pardon Attorney to the President of the United States. | Presidential Communications Privilege<br>Deliberative in full<br>Privacy | 1084 |
| 6 | Memorandum from the Pardon Attorney to the DAG advising of the pardons granted by the President on a particular day. The memorandum discusses what the DAG had recommended to the President and includes an attachment with the name of the pardon applicant, their offense and some of the reasons for the pardon grant. | Presidential Communications Privilege<br>Deliberative in part<br>Privacy | 6 |
| 7 | E-mail within the Department of Justice, among officials in ODAG and OPA transmitting information on particular pardons, and requesting information, such as warrants and background investigations. There is also discussion on language for letters of advice. | Presidential Communications Privilege<br>Deliberative in part<br>Privacy in part because some people are deceased | 64 |
| 8 | Typed summaries of selected pending clemency cases containing views of various components or officials regarding each applicant and with occasional handwritten notes describing the DAG's view on a particular pardon, with a comparison of cases in which pardons were granted by the President. | Presidential Communications Privilege<br>Deliberative in full<br>Privacy | 9 |

| 9 | Computer print-outs from the OPA's computerized tracking system reflecting the status of pending clemency requests and the DAG's recommendations on those requests and also including, for some, e.g., whether victim consultation had been done, what was requested by the White House, the views of the OPA, and the Department's recommendation. | Presidential Communications Privilege Deliberative in full Privacy | 24 |
|---|---|---|---|
| 10 | Memoranda from Ms. Smolover to the Attorney General (including draft versions) providing the status of three pending pardon applications, including the background of an applicant, the Department's investigations, and the proposed recommendations of the Pardon Attorney and other officials. | Presidential Communications Privilege Drafts are deliberative in full, final versions are deliberative in part Privacy | 26 |
| 11 | Memoranda from the Pardon Attorney to the Attorney General providing the status of, and background information on, particular pardon applicants, and memoranda forwarding draft letters for the Attorney General's signature in response to a letter in support of a particular pardon applicant. | Presidential Communications Privilege Deliberative in part Privacy | 34 |

| 12 | Letters and memoranda between the Office of the Pardon Attorney, the White House and various United States Attorney's Offices (USAO's) in which the Pardon Attorney seeks the views of USAO's on particular pardons and the USAO's provide those views in letters to the Pardon Attorney or directly to the White House. This category also includes one memorandum from the Pardon Attorney to the Immigration and Naturalization Service seeking the immigration status of a particular applicant. | Presidential Communications Privilege<br>Deliberative in part<br>Privacy | 51 |
|----|----|----|----|
| 13 | Handwritten notes to and from the DAG, Ms. Smolover and Mr. Kevin Ohlson, Chief of Staff to the DAG, regarding recommendations on granting and denying pardons. | Presidential Communications Privilege<br>Deliberative in full<br>Privacy | 105 |
| 14 | One memorandum from Ms. Smolover to the DAG and one memorandum from Mr. Brian Jackson, ODAG, to Mr. Gary Grindler, Principal Associate DAG, providing the status of various pardon applications including their recommendations. | Presidential Communications Privilege<br>Deliberative in part<br>Privacy | 5 |
| 15 | Various lists of pending pardon cases and comparison lists showing selected cases either granted or denied. These lists include a brief summary of each case along with the recommendations of various parties such as the relevant sentencing judge and United States Attorney. | Presidential Communications Privilege<br>Deliberative in full<br>Privacy | 46 |

| 16 | Typed talking points for telephone conversations between the DAG and officials of the WHCO regarding clemency matters in general and some specific pardon applicants. | Presidential Communications Privilege Deliberative in full Privacy | 12 |
|----|----|----|----|
| 17 | Memoranda between the Pardon Attorney and the Federal Bureau of Investigation (FBI) regarding the background investigations of certain pardon applicants. | Presidential Communications Privilege Deliberative in part Privacy | 6 |
| 18 | One memorandum from the WHCO to the President discussing the Justice Department's recommendations on particular pardon applications and advising the President whether or not they concur with the Department's recommendations. | Presidential Communications Privilege Deliberative in part Privacy | 10 |
| 19 | Unsigned draft letters of advice from the DAG to the President. | Presidential Communications Privilege Deliberative in full Privacy | 1209 |
| 20 | E-mail messages between Ms. Smolover and various Department officials regarding clemency matters in general and certain pardon applications in particular. | Presidential Communications Privilege Deliberative in part Privacy | 44 |
| 21 | One e-mail and two memoranda from the OPA to the ODAG providing responses to inquires from the ODAG on particular pardon cases. | Presidential Communications Privilege Deliberative in part Privacy | 6 |
| 22 | Typed chronology from the OPA regarding a particularly complex pardon application. | Presidential Communications Privilege Deliberative in full Privacy | 12 |

| 23 | Draft memoranda from the Attorney General or the DAG to the FBI or Interpol seeking records checks on a pardon applicant. | Presidential Communications Privilege Deliberative in full Privacy | 6 |
|----|----|----|----|
| 24 | Draft versions of "Executive Grants of Clemency" with varying language prepared for the President's signature. | Presidential Communications Privilege Deliberative in full Privacy | 11 |
| 25 | Department of Justice memorandum from personnel in the ODAG discussing and analyzing the merits of numerous pardon applications. | Presidential Communications Privilege Deliberative in part Privacy | 20 |
| 26 | Memoranda from the Pardon Attorney or the DAG to the WHCO forwarding letters of advice to the President or proposed recommendations for denials of pardons. | Presidential Communications Privilege Deliberative in part Privacy | 398 |
| 27 | Memoranda from the Pardon Attorney to the DAG providing proposed recommendations for or against granting particular pardon applications. | Presidential Communications Privilege Deliberative in part Privacy | 339 |
| 28 | Memoranda (including drafts) from Ms. Smolover to the DAG forwarding the OPA's proposed recommendations on particular pardons and providing her recommendations. | Presidential Communications Privilege Deliberative in part, drafts are deliberative in full Privacy | 388 |
| 29 | Memoranda from employees in the ODAG to Ms. Smolover providing background information and proposed recommendations on particular pardon applicants. | Presidential Communications Privilege Deliberative in part Privacy | 19 |

| 30 | Memoranda and e-mail from the Pardon Attorney to Ms. Smolover providing updated information and proposed recommendations on particular pardon applicants, including comparison lists of previous pardon grants for particular categories of cases. | Presidential Communications Privilege Deliberative in part Privacy | 119 |
|---|---|---|---|
| 31 | Memoranda from the Pardon Attorney to the ODAG, two memoranda from Ms. Smolover to Mr. Ohlson, and a draft memorandum from the DAG to the Counsel to the President, forwarding charts reflecting the status of pending pardon cases including whether the OPA is awaiting a background investigation or recommendations from the USAO's, whether a favorable recommendation is being prepared by the Pardon Attorney, etc. | Charts: Presidential Communications Privilege Deliberative in full Privacy Cover memos - Presidential Communications Privilege Deliberative in part, except for one draft memo which is deliberative in full | 148 |
| 32 | Memoranda from Ms. Smolover to the Pardon Attorney forwarding the DAG's recommendations for or against particular pardon applications and asking that they be forwarded to the White House Counsel's Office. | Presidential Communications Privilege Deliberative in part Privacy | 81 |
| 33 | Two letters solicited by the OPA from a federal judge containing the judge's views on an applicant. | Presidential Communications Privilege Deliberative in full | 2 |

| 34 | A. Pardon petitions with attachments and exhibits, two groups of exhibits (without petitions attached), and three letters. | A. Privacy: 484 pages withheld in full (Two letters, totaling four pages, are drafts and are also protected as deliberative.) | 524 |
|----|----|----|----|
| | B. Letters to or from pardon applicants or their counsel, letters from a Senator and a supporter, and responses from the OPA, administrative notes, and letters from the White House to the DAG notifying him of the President's decisions on certain clemency requests. | B. Privacy: 40 pages withheld in part | |

Legend:
OPA - Office of the Pardon Attorney
DAG - Deputy Attorney General
ODAG - Office of the Deputy Attorney General
WHCO - White House Counsel's Office
USAO - United States Attorney's Office
FBI - Federal Bureau of Investigation

1

RANDOLPH, *Circuit Judge*, dissenting: In my view, documents originated for the sole purpose of advising the President on his pardon power are protected by the presidential communications privilege. The President alone has the "Power to grant Reprieves and Pardons for Offenses against the United States," U.S. CONST. art. II, § 2, cl. 1; he cannot delegate this authority. *See* THE FEDERALIST No. 74 (Alexander Hamilton). In exercising his nondelegable power to pardon, the President has historically requested and received recommendations from the Office of Pardon Attorney, as reviewed by the Deputy Attorney General. The Pardon Attorney produces documents and other information in determining what advice to give to the President. As in *In re Sealed Case*, this information is "generated in the course of advising the President in the exercise of . . . a quintessential and nondelegable Presidential power." 121 F.3d 729, 752 (D.C. Cir. 1997). It follows that the information and documents, as well as the final recommendation, are privileged. "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974); *see Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 447 n.10 (1977).

The majority agrees that the presidential communications privilege protects the Pardon Attorney's final recommendations sent to the President. But it holds the privilege inapplicable to the drafts of those recommendations, or to any other documents the Pardon Attorney or his supervisor, the Deputy Attorney General, produce in formulating advice to the President on "Reprieves and Pardons." U.S. CONST. art. II, § 2, cl. 1. *In re Sealed Case* gave good reasons for holding the opposite: "In the vast majority of cases, few if any of the documents advisers generate in the course of their own preparation for rendering advice to the President, other than documents embodying their final recommendations, will ever enter the Oval Office. Yet these pre-decisional documents are usually highly revealing as to the evolution of advisers' positions and as to the different policy options considered along the way. If these materials are not protected by the presidential privilege, the President's access to candid and

informed advice could well be significantly circumscribed." 121 F.3d at 750.

The majority has two grounds, repeated in many different ways, for departing from this precedent. The first relies on an organizational chart, the second on a slippery slope.

The Office of Pardon Attorney is in the Department of Justice rather than at 1600 Pennsylvania Avenue. Hence the Pardon Attorney is not in "close proximity" to the Oval Office (maj. op. at 20); he is "not close enough to the President" (*id*. at 15); he is "at least twice removed from the President" because his recommendations are reviewed by the Deputy Attorney General (*id*. at 14, 20); he is too far away from the President (*id*. at 11). I think none of this matters. The talk – actually dicta – in *In re Sealed Case* about operational proximity to the President, 121 F.3d at 752, was directed at ensuring that documents were generated for the purpose of advising the President.[1] There is no need to worry about that here. Despite hints to the contrary in the majority opinion, the uncontested fact in this case is that all of the Pardon Attorney's duties and responsibilities are aimed at formulating advice for the President about pardons. As to documents involving the Deputy Attorney General, there is no contention that he was doing anything else than participating in the Pardon Attorney's preparation of recommendations to the President. In these circumstances, "there is assurance that even if the President were not a party to the communications over which the government is asserting presidential privilege, these communications nonetheless are intimately

---

[1] The majority opinion also relies on *Ryan v. Dep't of Justice*, 617 F.2d 781 (D.C. Cir. 1980). *Ryan* has nothing to do with the issue in this case. The issue in *Ryan* was whether a particular entity was an "agency" within the meaning of the Freedom of Information Act. Everyone agrees the Office of Pardon Attorney is an agency. The question here is whether the presidential communications privilege protects the materials the Office of Pardon Attorney and the Deputy Attorney General generate for the purpose of advising the President, a question on which *Ryan* had nothing to say.

connected to his presidential decisionmaking." *In re Sealed Case*, 121 F.3d at 753.[2]

Nonetheless the majority treats as decisive the dicta in *In re Sealed Case* stating that the privilege applies only to information "solicited and received"[3] by the President or his close advisers and their staff, 121 F.3d at 752. It is bad enough "to dissect the sentences of the United States Reports as though they were the United States Code." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc). It is far worse to treat dicta in one of our opinions as if it were some sort of statute. Besides, the extraneous statement in *In re Sealed Case* itself rested on the following dicta in *Association of American Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 910 (D.C. Cir. 1993) (*AAPS*): "We believe it is the Task Force's operational *proximity* to the President, and not its exact function at any given mo-

---

[2] The full quotation is:

> In this case the documents in question were generated in the course of advising the President in the exercise of his appointment and removal power, a quintessential and non-delegable Presidential power. In many instances, presidential powers and responsibilities, for example the duty to take care that the laws are faithfully executed, can be exercised or performed without the President's direct involvement, pursuant to a presidential delegation of power or statutory framework. But the President himself must directly exercise the presidential power of appointment or removal. As a result, in this case there is assurance that even if the President were not a party to the communications over which the government is asserting presidential privilege, these communications nonetheless are intimately connected to his presidential decisionmaking.

*In re Sealed Case*, 121 F.3d at 752-53 (citation and parenthetical omitted).

[3] There is no dispute that the White House "solicits" advice from the Pardon Attorney and Deputy Attorney General. Pardon requests are addressed directly to the President, who then submits the applications to the Pardon Attorney.

ment, that implicates executive powers.... The President's confidentiality interest is strong regardless of the particular role the Task Force is playing on any given day." The court in *AAPS* was not referring to members of the immediate White House staff. The "Task Force" was established by the President to advise him on health care legislation. 997 F.2d at 901. The majority opinion comes up with nothing to distinguish such a group, drawn from throughout the Executive Branch, from the Office of the Pardon Attorney. If the President set up an executive branch task force each time he received a pardon application and asked the members to advise him whether to grant or deny the pardon, there is no doubt that the work of each such task force would be covered by the privilege. It can make no difference that the President, instead, relies on a permanent office to perform the same function.

The majority's other reason for not holding the privilege applicable to the Pardon Attorney is of the slippery slope variety: if the privilege applied this "would have far-reaching implications for the entire executive branch that would seriously impede the operation and scope of FOIA" (maj. op. at 18); it "would sweep within the reach of the presidential privilege much of the functions of the executive branch" (*id.* at 22); it would result in " 'expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President.' " *Id.* at 21, *quoting In re Sealed Case*, 121 F.3d at 752.

The slope is slippery, the majority argues, because there is no non-arbitrary line between this case and other FOIA cases throughout the Executive Branch. The argument is invalid. The dividing line is clear, it is unmistakable and it is principled. It is a line *In re Sealed Case* itself recognized in distinguishing advice about "a quintessential and nondelegable Presidential power," which is subject to the privilege, from "information regarding governmental operations that do not call ultimately for direct decisionmaking by the President," which is not. 121 F.3d at 752. The vast majority of executive branch documents – those relating either to delegated responsibilities or having purposes other than advising

the President on a nondelegable duty – would therefore not be swept in if the privilege were applied here.

In response to this dissent, the majority opinion tells us: "The reality is that working papers of an immediate White House adviser in the Office of the President will be far more revelatory of advice given to the President than internal Department [of Justice] documents...." Maj. op. at 24. I do not know where the majority gets this idea. The record does not support it. It is impossible for me to understand how one can say that the Pardon Attorney's drafts of his final recommendation to the President will reveal less about advice to the President than the internal musings of those in the President's immediate vicinity. In short, the Pardon Attorney's proximity to the President is not the key. It is the function the Pardon Attorney performs that should have controlled.

The majority takes comfort in the fact that some of the Pardon Attorney's documents it has artificially excluded from the presidential privilege "will in any event remain protected pursuant to the deliberative process privilege," thus making the "justification" for applying the presidential communications privilege "disappear[ ]." Maj. op. at 16. This too is an unwarranted departure from the essential reasoning of *In re Sealed Case*. "The protection offered by the more general deliberative process privilege will often be inadequate to ensure that presidential advisers provide knowledgeable and candid advice, primarily because the deliberative process privilege does not extend to purely factual material." 121 F.3d at 750. More than that, "[e]xposure of the factual portions of presidential advisers' communications also represents a substantial threat to the confidentiality of the President's own deliberations. Knowledge of factual information gathered by presidential advisers can quickly reveal the nature and substance of the issues before the President...." *Id.* In response the majority has nothing to say.

I therefore dissent.